PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

INTERNATIONAL BANCORP, LLC;
INTERNATIONAL SERVICES,
INCORPORATED; INTERNATIONAL
LOTTERIES, LLC; LAS VEGAS
SPORTSBOOK, INCORPORATED;
BRITANNIA FINANCE CORPORATION,
   *Plaintiffs-Appellants,*

      v.

SOCIETE DES BAINS DE MER ET DU
CERCLE DES ETRANGERS A MONACO,
   *Defendant-Appellee.*

No. 02-1364

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-01-115-A)

Argued: December 3, 2002

Decided: May 19, 2003

Before NIEMEYER, LUTTIG, and MOTZ, Circuit Judges.

___

Affirmed by published opinion. Judge Luttig wrote the majority opinion, in which Judge Niemeyer joined. Judge Motz wrote a dissenting opinion.

___

## COUNSEL

**ARGUED:** Anthony James DeGidio, Jr., Toledo, Ohio, for Appellants. George Reynolds Hedges, QUINN, EMANUEL, URQUHART,

OLIVER & HEDGES, L.L.P., Los Angeles, California, for Appellee. **ON BRIEF:** James W. Pravel, Alexandria, Virginia, for Appellants. Gregory P. Barbee, QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, L.L.P., Los Angeles, California; Carl J. Nichols, BOIES, SCHILLER & FLEXNER, L.L.P., Washington, D.C., for Appellee.

---

## OPINION

LUTTIG, Circuit Judge:

Plaintiff companies appeal from the district court's summary judgment that their registration and use of forty-three domain addresses infringe a foreign corporation's rights under the Lanham Act and violate the Anticybersquatting Act, where the foreign corporation advertised its trademark domestically, but only rendered services under it abroad. We conclude that the district court's judgment, although not its reasoning, was correct, and therefore affirm.

## I.

Appellee, Societe des Bains de Mer et du Cercle des Etrangers a Monaco ("SBM"), owns and operates historic properties in Monte Carlo, Monaco, including resort and casino facilities. One of its properties, a casino, has operated under the "Casino de Monte Carlo" trademark since 1863. The mark is registered in Monaco, but not in the United States. SBM promotes this casino, along with its other properties, around the world. For 18 years, SBM has promoted its properties from a New York office staffed with four employees. SBM's promotions within the United States, funded with $1 million annually, include trade show participation, advertising campaigns, charity partnerships, direct mail solicitation, telephone marketing, and solicitation of media coverage.

Appellants, the plaintiff companies, are five companies formed and controlled by a French national, which operate more than 150 web sites devoted to online gambling. Included in this roster are 53 web sites whose domain addresses incorporate some portion of the term "Casino de Monte Carlo."[1] These web sites, along with the gambling

---

[1] *E.g.*, casinodemontecarlo.com, casinodemontecarlo.net, casinomonte-carlo.com, casinomontecarlo.net, casinomontecarlo.org, and casino-

software they employ, also exhibit pictures of *the* Casino de Monte Carlo's exterior and interior, contain renderings that are strikingly similar to the Casino de Monte Carlo's interior, and make allusion to the geographic location of Monte Carlo, implying that they offer online gambling as an alternative to *their* Monaco-based casino, though they operate no such facility.

When SBM learned of the plaintiff companies' web sites and their uses of the "Casino de Monte Carlo" mark, it challenged them in the World Intellectual Property Organization (WIPO). A WIPO panel ruled against the plaintiff companies and ordered the transfer of the 53 domain addresses to SBM. To escape this judgment, the plaintiff companies brought suit in federal court against SBM seeking declaratory judgment, pursuant to 28 U.S.C. § 2201(a), that they are entitled to the disputed domain names. SBM counterclaimed under the Lanham Act (15 U.S.C. § 1111 *et seq.*) for trademark infringement under section 1125(a);[2] trademark dilution under section 1125(c); cybersquatting under section 1125(d)(1); and unfair competition in violation of section 1126(h). The district court ruled against SBM on its section 1125(c) trademark dilution claim, because SBM had not shown actual economic harm, and on its section 1126(h) unfair competition claim. But the court ruled in favor of SBM on its trademark infringement claim and on its cybersquatting claim, awarding SBM $51,000 in statutory damages and transfer of 43 of the 53 contested domain addresses.[3] The plaintiff companies now appeal from that adverse judgment.

---

montecarlo.net.

[2]SBM actually styled its section 1125(a) counterclaim as an unfair competition suit. *See* J.A. at 64. The district court, although recognizing it as such at the outset of its opinion, treated the counterclaim throughout as a trademark infringement claim. Because the tests for trademark infringement and unfair competition under section 1125(a) are identical, we adopt the district court's usage and refer to this claim as a trademark infringement claim.

[3]SBM also alleged Virginia common law trademark infringement, but the district court deemed it unnecessary to address this claim because federal law provided adequate relief.

II.

Although the district court decided this case on motions for summary judgment, factual determinations underlay its ultimate ruling (*e.g.*, findings as to likelihood of confusion and secondary meaning). The plaintiff companies contend that the court exceeded its summary judgment authority by resolving such questions of fact. Two factors present in this case justify the judicial posture taken by the court, however. First, the parties, having prepared for a bench trial, *agreed to submit the voluminous record to the court for dispositive decision* at the time of the summary judgment motions, *see* J.A. at 1002-03 (the court: "there is really no reason why the Court should not dispose of this matter on the current record; isn't that right?" Attorney for the plaintiff companies: "I believe that's correct, your Honor." Attorney for SBM: "I think that sounds sensible, your Honor." Attorney for defendant Levy: "That's exactly what I would ask for, your Honor." The court: "All right.").

Secondly, the court's disposition of the case was consistent with the fact that the parties did not contradict one another's proffered facts, but only disputed the inferences that a fact finder would draw from those underlying facts. With the parties' voluntary submission of the record, comprised of only uncontroverted proffers, before it, and being en route to a bench trial anyway, the court properly proceeded to judgment in the case. *Cf. Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991) ("[I]t makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts. If a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district judge properly should draw his inferences without resort to the expense of trial." (quotations and citations omitted)).

Because the court decided the case on summary judgment motions, we review its legal determinations *de novo*, *see Lone Star Steakhouse & Saloon, Inc.* v. *Alpha of Virginia, Inc.*, 43 F.3d 922, 928 (4th Cir. 1995). But since it also engaged in fact-finding to dispose of the matter, we review its findings of fact for clear error. *See*, *e.g.*, *Petro Stopping Centers, L.P.* v. *James River Petroleum, Inc.*, 130 F.3d 88, 91-

92 (4th Cir. 1997) ("This circuit reviews district court determinations regarding likelihood of confusion under a clearly erroneous standard."); *RFE Industries, Inc.* v. *SPM Corp.*, 105 F.3d 923, 925 (4th Cir. 1997) ("[The] district court's findings [as to secondary meaning] may be disturbed on appeal only if they are clearly erroneous.").[4]

### III.

The plaintiff companies first challenge the district court's determination that their use of 43 domain addresses violated 15 U.S.C. § 1125(a) of the Lanham Act, infringing on SBM's trademark. Central to their challenge is the claim that SBM did not have a protectible interest in the "Casino de Monte Carlo" mark, a prerequisite to SBM's ability to claim against the plaintiff companies under the Act. *See* 15 U.S.C. § 1125(a)(1) (allowing only a person "who believes that he or she *is or is likely to be damaged*" by the defendant's use of a confusing mark to bring a civil action); *see also Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 930 (proving trademark infringement under 15 U.S.C. § 1125(a) requires a plaintiff to prove it has a protectible mark).

This circuit requires that an *unregistered* trademark satisfy two requirements if its owner is to have a protectible interest in the trademark: The mark must be used in commerce, *see* 15 U.S.C. § 1051 (only trademarks "used in commerce," or which a person has a bona

---

[4]Though the dissent initially notes the *two* bases on which we conclude that the district court properly decided this case upon the submission of the record, it only takes issue with the first, that the parties intended their submission to allow the court to reach dispositive judgment. *See post* at 54-58. Yet, the strength of our second rationale is only made more clear by the dissent's own analysis.

In discussing the factual findings the district court made, the dissent says repeatedly that "a fact-finder could well infer" differently. *See post* at 61. But, of course, that misses the whole point. The court, by the agreement of the parties (who agreed to a *bench* trial), was the fact finder. And *all* of the factual issues decided, were issues resolved by *inference* of the fact finder from *undisputed* facts. With no dispute as to the facts present, it was not improper for the court, here the fact finder, to make its findings at this point in the proceedings.

fide intention to use in commerce, can be registered, signaling Lanham Act protectibility); *see also Larsen* v. *Terk Technologies Corp.*, 151 F.3d 140, 146 (4th Cir. 1998) ("to receive protection under [1125(a)] a trademark . . . must be "in use" in commerce"), and it must be distinctive, *see Sara Lee Corp.* v. *Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996) (noting that the degree of protection a mark may receive is directly related to its distinctiveness). The plaintiff companies argue that the district court erred in concluding that SBM met these two requirements. We address both arguments in turn.

A.

Both parties have agreed, in their briefs and at oral argument, that the critical question in assessing whether SBM "used its mark in commerce" is whether the *services* SBM provided under the "Casino de Monte Carlo" mark were *rendered in commerce*. As shown below, the Lanham Act's plain language makes this conclusion unavoidable and the parties' agreement unsurprising.

We must first contend with a threshold matter, however. This circuit has never directly addressed the scope of the term "commerce" within the Lanham Act. Because of the clarity of the Act's own definition of the term, *see* 15 U.S.C. § 1127 (defining "commerce" as "all commerce which may lawfully be regulated by Congress"), we now hold that "commerce" under the Act is coterminous with that commerce that Congress may regulate under the Commerce Clause of the United States Constitution. The other circuits to address this question have concluded the same. *See*, *e.g.*, *United We Stand America, Inc.* v. *United We Stand, America, NY, Inc.*, 128 F.3d 86, 92-93 (2nd Cir. 1997); *Planetary Motion* v. *Techsplosion*, 261 F.3d 1188, 1194 (11th Cir. 2001). Of course, Article I of the Constitution provides that,

> [t]he Congress shall have Power . . . to regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes[.]

*U.S. Const.* art. I, § 8, cl. 3. Consequently, "commerce" under the Lanham Act necessarily includes all the explicitly identified variants of interstate commerce, foreign trade, and Indian commerce.

Understanding commerce under the Act to be coterminous with that commerce Congress may regulate under the Commerce Clause, we turn next to the determination of what constitutes "*use in commerce*" under the Act. Again we rely on section 1127, which provides, of particular relevance here, a specific definition of that term as it relates to servicemarks, which the "Casino de Monte Carlo" mark unquestionably is:

> The term "use in commerce" means the *bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark*. For purposes of this chapter, a mark shall be deemed to be used in commerce —
>
> . . . .
>
> (2) *on services* when it is used or displayed in the sale or advertising of services *and the services are rendered in commerce*, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127 (emphasis added).

Consistent with this definition of the statutory "use in commerce" requirement, the Supreme Court has said that "[t]here is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. . . . [T]he right to a particular mark grows out of its use, not its mere adoption;" *United Drug Co.* v. *Theodore Rectanus, Co.*, 248 U.S. 90, 97 (1918). Because a mark is used in commerce only if it accompanies services rendered in commerce, *i.e.*, it is employed appurtenant to an established business or trade that is in commerce, "mere advertising" of that mark does not establish its protectibility, though advertising is itself commerce that Congress may regulate.

With these principles in clear view, we proceed to address whether the "Casino de Monte Carlo" mark was used in commerce. In their briefs and before the court below, the parties debate principally

whether the activities of SBM's New York office conducted under the "Casino de Monte Carlo" mark constitute services rendered in interstate commerce. SBM, for its part, contends that the office's booking of reservations is a rendered service, and that its maintenance of the office, its advertising in this country, and its promotional web page attach the "Casino de Monte Carlo" mark for sales and advertising purposes to this interstate service, thereby satisfying the "use in commerce" requirement. The plaintiff companies argue, to the contrary, that there is no evidence in the record that the New York office books reservations to the casino, and that, as a result, the office engages in no activity beyond "mere advertising." They argue further that the casino gambling services are the only established business to which the trademark applies, and that *that* service, being rendered in Monaco, is not rendered in commerce that Congress may regulate. The district court, accepting SBM's arguments, concluded as follows:

> [I]t is clear from the undisputed record that SBM's New York office was one of SBM's many international sales offices from which customers could book reservations. Thus, the record shows that in this respect, SBM "services are rendered" in the United States.

*Int'l Bancorp* v. *SBM*, 192 F. Supp. 2d 467, 479-80 (E.D. Va. 2002) [*Summary Judgment*].

SBM's argument and the district court's reasoning are in error because the New York-office bookings on which they rely do not relate to the casino in question, but, rather, to SBM's resort facilities. As became evident at oral argument and upon our review of the record, SBM's assertion that the record contains evidence that its New York office booked reservations to the casino is unsubstantiated. The plaintiff companies correctly point out that since the "Casino de Monte Carlo" mark only pertains to the casino and its gambling services, any guest reservations SBM's New York office and web site book for SBM's various resorts, which reservation services the record does disclose, are irrelevant to the analysis. And the other operations of SBM's New York office, at least as they appear in the record, are merely promotional in nature. The Lanham Act and the Supreme Court, as shown above, make clear that a mark's protection may not be based on "mere advertising."

Because SBM presented no record evidence that the New York office did anything other than advertise the "Casino de Monte Carlo" mark, if its case rested on this alone, the plaintiff companies would have the better of the argument. When they appeared before the court, however, we asked the parties to address themselves to the question of whether the casino services at issue were rendered in foreign trade, and the plaintiff companies conceded that the record contained evidence that United States citizens went to and gambled at the casino. This concession, when taken together with the undisputed fact that the Casino de Monte Carlo is a subject of a foreign nation, makes unavoidable the legal conclusion that foreign trade was present here, and that as such, so also was "commerce" under the Lanham Act.

Since the nineteenth century, it has been well established that the Commerce Clause reaches to foreign trade. And, for the same length of time, the Supreme Court has defined foreign trade as trade between subjects of the United States and subjects of a foreign nation. *See In re: Trademark Cases*, 100 U.S. 82, 96 (1879) ("commerce with foreign nations means commerce between citizens of the United States and citizens and subjects of foreign nations"); *see also Henderson* v. *Mayor of City of New York*, 92 U.S. 259, 270 (1875) (same); *United States* v. *Holliday*, 70 U.S. 407, 417 (1865) (same). And, of course, commerce does not solely apply "to traffic, to buying and selling, or the interchange of commodities . . . Commerce, undoubtedly, is traffic, but it is something more: it is [commercial] intercourse." *Gibbons* v. *Ogden*, 22 U.S. 1, 189 (1824) (C.J. Marshall). Service transactions are clearly commercial intercourse, and by extension can clearly constitute foreign trade. *Cf. United States* v. *American Building Maintenance Indus.*, 422 U.S. 271, 283 (1975) (noting that an entity engages in commerce when it is "directly engaged in the production, distribution, or acquisition of goods *or services* in interstate commerce") (emphasis added). Thus, while SBM's promotions within the United States do not on their own constitute a use in commerce of the "Casino de Monte Carlo" mark, the mark is nonetheless used in commerce because United States citizens purchase casino services sold by a subject of a foreign nation, which purchases constitute trade with a foreign nation that Congress may regulate under the Commerce Clause. And SBM's promotions "use[ ] or display[ ] [the mark] in the sale or advertising of [these] services . . . rendered in commerce."

At oral argument, the plaintiff companies objected to this straightforward reasoning. They argued first that any trade that United States citizens engaged in at the casino was not subject to regulation by Congress since it did not occur in the United States.

> *COURT*: Commerce [*i.e.*, commerce within Congress' regulatory ambit, and thus equally commerce under the Lanham Act] includes services with a foreign country doesn't it?

> *Appellant*: Not unless they're rendered in the United States.

> *COURT*: Unless the Supreme Court has held otherwise?

> *Appellant*: Unless the Supreme Court has held otherwise, of course.

Oral Argument, Dec. 3, 2002. In the alternative, they argued that even if Congress could regulate transactions between United States citizens and foreign subjects that occur abroad, the particular transactions at issue here should not be considered foreign trade because the Casino de Monte Carlo was a "playground for the very, very rich," *id.*, and thus did not have a substantial effect on foreign trade. Both arguments are unavailing.

The plaintiff companies' first argument fails because the *locality* in which foreign commercial intercourse occurs is of no concern to Congress' power under the Constitution to regulate such commerce. In *United States* v. *Holliday*, when examining the extent of Congress' authority over Indian commerce, the Supreme Court noted that under *Gibbons* v. *Ogden* the foreign commerce power "must be exercised wherever the *subject* exists. . . . The *locality* of the traffic can have nothing to do with the power." *Holliday*, 70 U.S. at 417-18 (emphasis added). The subject of foreign trade, as the Supreme Court noted in *In re: Trademark Cases*, *Henderson*, and *Holliday*, is defined not by where the trade occurs, but by the characteristics of the parties who engage in the trade, just as the *Holliday* Court concluded that the subject of Indian commerce is defined not by whether the commerce occurs on Indian territory, but rather by whether the trade brings United States citizens and tribal Indians together as transacting part-

ners. *See also United States* v. *Mazurie*, 419 U.S. 544, 554 (1975) ("This Court has repeatedly held that [the Indian commerce clause] affords Congress the power to prohibit or regulate the sale of alcoholic beverages to tribal Indians, *wherever situated . . .*" (emphasis added)).

Thus it is that Congress has validly enacted laws such as the Trading With the Enemy Act (TWEA), Act of Oct. 6, 1917, ch. 106, 40 Stat. 411, and the International Emergency Economic Powers Act (IEEPA), title II, Pub. L. 95-223, 91 Stat. 1626 *et seq.*, codified at 50 U.S.C. § 1701 *et seq.*, under its authority to regulate foreign commerce and has provided, via those enactments, for the regulation of commercial intercourse between United States citizens and subjects of foreign nations, *see*, *e.g.*, *United States* v. *Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975) (upholding broad import surcharge on products imported by United States citizens in transactions with Japanese sellers, which regulation was issued by the executive under TWEA's delegation of foreign commerce authority). And more importantly here, thus it is also that these laws extend their regulations to reach commercial intercourse that occurs solely on the foreign sovereign's soil. *See*, *e.g.*, 31 C.F.R. § 515.560(a)(3) (1977) (prohibiting United States citizens from purchasing merchandise in Cuba with a foreign market value in excess of $100). Such embargo authority, encompassing embargoes of commercial intercourse abroad by United States citizens with subjects of foreign nations, has long been recognized to be a valid exercise of Congress' foreign commerce clause power:

> It has, we believe, been universally admitted, that [the foreign commerce clause] comprehend[s] every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend.

*Gibbons* v. *Ogden*, 22 U.S. at 193-94.

> Congress are, by the Constitution, vested with the power to regulate commerce with foreign nations; and however, at periods of high excitement, an application of the terms "to regulate commerce" such as would embrace absolute prohi-

bition may have been questioned, yet, since the passage of the embargo and non-intercourse laws, and the repeated judicial sanctions those statutes have received, it can scarcely, at this day, be open to doubt, that every subject falling within the legitimate sphere of commercial regulation may be partially or wholly excluded . . . Such exclusion cannot be limited to particular classes or descriptions of commercial subjects; it may embrace manufactures, bullion, coin, or any other thing. The power once conceded, it may operate on any and every subject of commerce to which the legislative direction may apply it.

*United States* v. *Marigold*, 50 U.S. 560, 566-67 (1850). The Supreme Court's acceptance of this expansive authority confirms that Congress may regulate foreign trade wherever it occurs.

Nor, in modern times, has the Supreme Court ever suggested that Congress' authority over foreign trade is limited in the manner that the plaintiff companies suggest. To the contrary, when it has considered the scope of Congress' authority over foreign trade, the Court has emphasized the expansive nature of that authority. *See*, *e.g.*, *Pfizer, Inc.* v. *India*, 434 U.S. 308, 313 n.11 (1978) ("The Chief Justice's dissent seems to contend that the Sherman Act's reference to commerce with foreign nations was intended only to reach conspiracies affecting goods imported into this county. But the scope of congressional power over foreign commerce has never been so limited . . ." (citations omitted)).

Congress' interest in foreign trade and the Executive's interest in foreign affairs unavoidably intersect, and this intersection can give the mistaken impression that Congress' authority over foreign trade must be limited so as to accommodate the President's authority over foreign affairs. The first interest, that of foreign trade, the Constitution assigns entirely to the legislative authority of Congress. *See U.S. Const.* art. I, § 8, cl. 3. The second, that of foreign affairs, it assigns jointly to the political branches (*i.e.*, Congress *and* the Executive). *See U.S. Const.* art. I, § 8, cl. 1 and 11; *id*. art. II, § 2. The intersection of these two interests, and the dual allocation of authority over the latter, has long been noted:

> If our government should make [restrictions on foreign commerce] the subject of a treaty, there could be no doubt that such a treaty would fall within the power conferred on the President and the Senate by the Constitution. [Foreign commerce] is in fact, in an eminent degree, a subject which concerns our international relations, in regard to which foreign nations ought to be considered and their rights respected, whether the rule be established by treaty or by legislation.

*Henderson*, 92 U.S. at 273. But no precedent suggests that the intersecting foreign affairs power the Constitution vests in the Executive in any way curtails the foreign trade power the Constitution vests in Congress, and there is thus no rationale for limiting the scope of congressional authority in the realm of foreign commerce to commercial intercourse that occurs solely within the United States.[5]

The plaintiff companies' second argument, that the purchase of gambling services by United States citizens at the Casino de Monte Carlo is not commerce because it does not have a substantial effect on the foreign commerce of the United States, also fails. The substantial effects test is not implicated here at all.

The Supreme Court has articulated the substantial effects test to ensure that Congress does not exceed its constitutional authority to regulate interstate commerce by enacting legislation that, rather than regulating interstate commerce, trammels on the rights of states to regulate purely intra-state activity for themselves pursuant to their police power. *See United States* v. *Morrison*, 529 U.S. 598, 608-09 (2000). But while "Congress' power to regulate interstate commerce

---

[5]United States courts may lack *jurisdiction* under which to *enforce* legislation Congress promulgates concerning trade that occurs on foreign soil between United States citizens and foreign subjects, particularly against those foreign subjects, but this inability to secure jurisdictional authority creates only a practical shortcoming with such legislation, making it perhaps less effective a manner to regulate foreign trade than treaty or convention. Though "in the case of foreign commerce the national government might act through a treaty," *Bob-Lo Excursion Co.* v. *Michigan*, 333 U.S. 28, 42 (1948) (Douglas, J., dissenting), Congress' authority under Article I of the Constitution remains whole and undiminished.

may be restricted by considerations of federalism and state sovereignty[,] [i]t has never been suggested that Congress' power to regulate foreign commerce could be so limited." *Japan Line Ltd.* v. *Los Angeles County*, 441 U.S. 434, 448 n.13 (1979).

> Although the Constitution, Art. I, § 8, cl. 3, grants Congress the power to regulate commerce "with foreign Nations" and "among the several States" in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater.

*Id*. at 448. The rationale that underlies application of the substantial effects test in the analysis of congressional legislation purporting to regulate interstate commerce is therefore absent from analysis of congressional legislation purporting to regulate foreign commerce.

Furthermore, the substantial effects test only limits Congress' authoritative reach with respect to one of the three broad categories of activity that Congress may regulate under the Commerce Clause.

> *First*, Congress may regulate the *use of the channels* of interstate commerce. . . . *Second*, Congress is empowered to regulate and protect *the instrumentalities* of interstate commerce . . . . *Finally*, Congress' commerce authority includes the power to regulate . . . those *activities that substantially affect* interstate commerce.

*Morrison*, 529 U.S. at 609 (emphasis added). Consequently, the substantial effects test does not limit Congress' regulation of activity that is itself commercial intercourse occurring interstate; it governs only Congress' regulation of non-commercial intercourse activity that effects interstate commerce.

Here, the regulated activity at issue is itself commercial intercourse (*i.e.*, the trademarks are an instrumentality of commercial intercourse and the provision of the services necessarily involves both channels of and instrumentalities of that commercial intercourse). And the regulated commercial intercourse involves transactions between United States citizens and the subject of a foreign nation, qualifying the inter-

course as a literal example of foreign trade. Even were the substantial effects test to govern some instances of congressional regulation of foreign trade, the present case, because it involves only the first two "broad categories of activity that Congress may regulate under its commerce power," *id.* at 608, and not the third, does not implicate the substantial effects test.[6]

The plaintiff companies, seeking to avoid the full import of this foreign trade analysis, ask us to be wary in addressing whether United States trademark protection can extend to services rendered abroad and suggest that other courts have decided this question in the negative with reasoning that should persuade us not to extend trademark protection in this instance. In particular, the plaintiff companies point to the Second Circuit's opinion in *Buti* v. *Perosa, S.R.L.*, 139 F.3d 98 (2nd Cir. 1998). In *Buti*, the Second Circuit decided that the *ad hoc* distribution in the United States of an Italian restaurant's t-shirts, key chains, and cards, by the owner of the restaurant who was also the owner of a modeling agency, to his colleagues in the modeling industry, did not establish that the mark was used in commerce.

*Buti* is not persuasive authority to us for several reasons, however. First, the *Buti* court did not analyze the application of the Lanham Act to foreign trade because, as it noted, the plaintiff, in a "pivotal concession[ ], . . . conceded at oral argument that . . . the food and drink services [it sells] form no part of the trade between Italy and the United States." *Id.* at 103. And in fact, even though the *Buti* court did not analyze trademark rights created via foreign trade, it did acknowledge the basis for such. *See id.* (noting that a key inquiry is "whether [the plaintiff] has conducted the affairs of its Milan Fashion Cafe in such a way as to "substantially affect" United States interstate or *foreign commerce*, and thereby fall within Congress' authority under the

---

[6]Insofar as the plaintiff companies are instead relying on their "substantial effects" argument not to challenge the determination that the activity at issue constitutes foreign trade, but to challenge the court's exercise of jurisdiction over them with regards to their extraterritorial conduct, *see Steele* v. *Bulova Watch Co.*, 344 U.S. 280 (1952), their objection fails. Both they and SBM submitted to the federal court's exercise of *in personam* jurisdiction over them. They cannot now challenge its exercise of such.

Commerce Clause"). Secondly, even had the *Buti* plaintiff not explicitly conceded that his business was not foreign trade, it is not clear that the facts before the *Buti* court would have established that the plaintiff used the mark in that putative foreign trade. As the Second Circuit carefully noted, the restaurant undertook no "formal advertising or public relations campaign [aimed at United States citizens]." *Id*. at 100.

Here, SBM does *not* concede that its services do not constitute foreign trade when United States citizens purchase them. Instead, the plaintiff companies concede the very elements we conclude constitute foreign trade. And quite clearly SBM has used the mark in its foreign trade, formally, and at great cost, advertising its services intentionally to United States citizens under the "Casino de Monte Carlo" mark. Because SBM used its mark in the sale and advertising of its gambling services to United States citizens; because its rendering of gambling services to United States citizens constitutes foreign trade; because foreign trade is commerce Congress may lawfully regulate; and because commerce under the Lanham Act comprises all commerce that Congress may lawfully regulate, the services SBM renders under the "Casino de Monte Carlo" mark to citizens of the United States are services rendered in commerce, and the "use in commerce" requirement that the Lanham Act sets forth for the mark's protectibility is satisfied.

## B.

The use of an unregistered mark in foreign trade does not in any way assure its owner that the mark will merit Lanham Act protection; it only makes such protection possible. For an unregistered mark that is used in foreign trade to merit Lanham Act protection, that mark must be distinctive among United States consumers. The plaintiff companies argue that even if the "Casino de Monte Carlo" mark is used in commerce, it is not distinctive because it is merely geographically descriptive, and that since it is not distinctive, it is not protectible.

Though the plaintiff companies correctly argue that the mark is geographically descriptive (*i.e.*, it geographically describes where the casino is located and nothing more), this objection does not foreclose

the mark's distinctiveness. Descriptive marks will be deemed distinctive if they achieve secondary meaning. *See Perini Corp.* v. *Perini Construction, Inc.*, 915 F.2d 121, 125 (4th Cir. 1990) ("Secondary meaning is the consuming public's understanding that the mark, when used in context, refers, not to what the *descriptive* mark ordinarily describes, but to the *particular* business that the mark is meant to identify." (emphasis added)). Thus, the relevant question here is whether the district court correctly found that the mark possessed secondary meaning.

The district court employed two distinct analyses to assess the secondary meaning of "Casino de Monte Carlo." The court engaged in traditional *Perini* analysis, examining a variety of factors — the *Perini* factors — that we have said are relevant in assessing secondary meaning. Though proof of secondary meaning is a "vigorous evidentiary requirement[ ]," *see id.*, plaintiffs can meet their burden by offering proof including, though not limited to, 1) advertising expenditures; 2) consumer studies linking the mark to a source; 3) sales success; 4) unsolicited media coverage of the product; 5) attempts to plagiarize the mark; and 6) the length and exclusivity of the mark's use. *See id.*

The district court, finding that SBM provided proof of substantial advertising expenditures; significant sales success within the United States; substantial unsolicited media coverage of the casino; frequent attempts by others to plagiarize the mark; and a long history of continuous, if not exclusive, use of the mark; concluded that SBM had met its burden. *Summary Judgment*, 192 F. Supp. 2d at 481-82. Upon our review of the record, we conclude that the court's conclusion as to these points is not clear error.

Furthermore, the district court noted that under our precedent in *Larsen* v. *Terk Technologies*, 151 F.3d 140, 148-49 (4th Cir. 1998), SBM met its burden of proving secondary meaning, irrespective of the *Perini* test, because it had established that the plaintiff companies *directly* and *intentionally* copied the "Casino de Monte Carlo" mark. *See Summary Judgment*, 192 F. Supp. 2d at 481 ("the record leaves no doubt that the plaintiff companies intentionally and directly copied SBM's mark"). Under *Larsen*, a trademark plaintiff that proves that the defendant directly and intentionally copied its mark is presumed

to have proved that mark's secondary meaning, and the defendant must then disprove that presumption. We decided *Larsen* on the logic of two prior cases, *Osem Food Industries Ltd.* v. *Sherwood Foods, Inc.*, 917 F.2d 161 (4th Cir. 1990), and *M. Kramer Mfg. Co., Inc.* v. *Andrews*, 783 F.2d 421 (4th Cir. 1986), which established that a person who directly and intentionally copies another's *trade dress* has the burden of refuting a presumption that the trade dress has secondary meaning.

The plaintiff companies argue that applying the presumption to trademarks, as *Larsen* does, as opposed to trade dress, as *Osem* and *M. Kramer* do, is unsupported by policy, violates Fed. R. Evid. 301, and has been rejected by other circuits. None of this, however, diminishes the precedential force that *Larsen* has on this case. And since the plaintiff companies did not present evidence sufficient to rebut the *Larsen* presumption, let alone to counter the *Perini* factors discussed above, the district court's conclusion that the "Casino de Monte Carlo" mark is distinctive, *see Summary Judgment*, 192 F. Supp. 2d at 482, must be affirmed.

The dissent contends that the district court did not engage in two distinct analyses of secondary meaning, but rather applied the *Larsen* presumption, and then improperly shifted the burden of proof to the plaintiff companies, in effect requiring them, unfairly, to *prove* that SBM's mark did not have secondary meaning. The district court did not so merge the analyses, and though it intertwined its two analyses, such was only natural since it was in the posture of the fact finder, and not simply addressing questions of law.

The district court's conclusion that the *Larsen* presumption applied placed a rebuttal burden on the plaintiff companies. That is, *if SBM had offered no proof of secondary meaning whatsoever*, SBM would still be due a finding that its mark enjoyed secondary meaning *unless* the plaintiff companies proffered *some evidence*, not ultimately persuasive evidence, just some evidence, that the fact finder concluded was probative in disproving secondary meaning. Here, upon looking at the relevant evidence presented by the plaintiff companies, which as one would expect the court did through the lens of the traditional *Perini* categories, the district court found that none of that evidence was probative, at any level.

In addition, having evaluated the evidence and found that none of it successfully rebutted the *Larsen* presumption, the court also noted that SBM's evidence, when evaluated in the applicable *Perini* categories resulted in findings sufficient to establish secondary meaning. Thus, the court said,

> In sum, *far from rebutting* the [*Larsen*] presumption of distinctiveness that operates here, the *Perini* factors, *when applied to the facts of this case*, actually support that presumption.

*Summary Judgment*, 192 F. Supp. 2d at 482 (emphasis added).

That the dissent, had it been the fact finder, might have drawn different inferences from the evidence, and so concluded that the *Larsen* presumption was rebutted, is irrelevant here. The district court was the fact finder, charged with drawing inferences from the evidence; it was that court's responsibility (as it would have been the jury's responsibility had the parties instead opted for a jury trial) to determine whether or not the plaintiff companies' presented *any* evidence that rebutted the *Larsen* presumption. The district court quite simply *found* that none of the evidence presented by the plaintiff companies was probative of a lack of secondary meaning, and on that finding alone, it could have concluded that SBM met the secondary meaning requirement. That the court went on to note that even under the *Perini* analysis SBM met its burden does not transform its analysis into one that requires the plaintiff companies to carry the ultimate burden.

### C.

Because the district court properly concluded, though for the wrong reasons, that the "Casino de Monte Carlo" mark was used in commerce, and because its conclusion that the mark had secondary meaning was not clearly erroneous, the court's determination that the mark was protectible was proper, and it did not err by proceeding to assess whether the plaintiff companies' use of the mark constituted trademark infringement.

### D.

The dissent's disagreement with this part of our holding today is based on (1) a conflation of the two critical elements of the "use in

commerce" inquiry, *see post* at 37-38 ("The majority reaches the unprecedented conclusion that an entity's *use* of its foreign trademarks *solely to sell* services in a foreign country entitles it to trademark protection under United States law, even though the foreign mark owner has *never used* or registered *its mark* in the United States."); (2) two cases decided by the Trademark Trial and Appellate Board ("TTAB"), which cases, like the dissent here, conflate the distinct elements of the two-pronged "use in commerce" requirement, *see post* at 42-43, 44-45 (citing to *Mother's Restaurant, Inc.* v. *Mother's Other Kitchen, Inc.*, 218 U.S.P.Q. 1046 (TTAB 1983), and to *Linville* v. *Rivard*, 41 U.S.P.Q.2d 1731 (TTAB 1997) ("*Linville II*")); and (3) policy arguments. *See post* at 46. With these grounds as its justification for deciding the matter differently, the dissent labels our application of the straightforward statutory command of the Lanham Act as one that "threatens to wreak havoc over our country's trademark law and would have a stifling effect on United States commercial interests generally," *see post* at 46. We address the dissent's bases for its disagreement seriatim.

But, before we address the dissent's reasoning, we note, we think importantly, that:

(1) The dissent does not disagree with the court's conclusion that the text of the Lanham Act extends protection to marks that meet the statutory requirements for being "used in commerce," provided they also enjoy secondary meaning;

(2) The dissent does not disagree with the court's conclusion that the "use in commerce" requirement entails two distinct elements: a service being rendered in commerce, and a mark for that service being used or displayed in the sale or advertising of that service.

(3) The dissent does not disagree with the conclusion that "commerce" under the Lanham Act is coterminous with commerce that Congress may regulate;

(4) The dissent does not disagree with the court's conclusion that the commerce at issue, the selling by SBM of gambling services to United States citizens abroad, constitutes foreign commerce under

Article I of the United States Constitution and so also constitutes commerce under the Lanham Act; and

(5) The dissent does not disagree with the court's conclusion that SBM did intentionally and formally use and display its mark in the sale and advertising of its services in the United States to United States citizens in an effort to spur sales of its services to them.

We believe that these conclusions alone justify our holding that SBM's mark would merit Lanham Act protection (provided the mark also enjoyed secondary meaning), and absent the dissent's disagreement on these points, we do not understand the statutory basis for its disagreement.

As to the dissent's failings, as we imagine them, first the dissent conflates the two distinct aspects of the statutory "use in commerce" requirement. The distinct elements of the analysis are set out above. *See supra* p. 7. But in short, section 1127 defines the term "use in commerce" with respect to services as being when a mark is "used or displayed in the sale or advertising of services *and* the services are rendered in commerce." As a consequence of the *conjunctive* command, it is not enough for a mark owner simply to render services in foreign commerce for it to be eligible for trademark protection. Nor is it enough for a mark owner simply to use or display a mark in the sale or advertising of services to United States consumers. *Both* elements are required, and *both* elements must be distinctly analyzed.

Though the dissent contends that it understands there are two distinct elements to the use in commerce requirement, *see post* at 37-38, its opinion betrays its claim. It must necessarily conflate the two elements to conclude, as it does, that today we hold "the protection of United States trademark law extends to a mark used *exclusively* in Monaco," *post* at 37, for it readily admits that only one of the two elements of use occurred abroad, the rendering of services, and that the other element, SBM's New York City-based brand-building efforts, did indeed occur in the United States.

This case presents a record replete with demonstrations of SBM's singularly impressive commitment to building brand identity in the United States. These efforts constitute, as we explain above, *see supra*

p. 21, a "use or display in the sale or advertising" of the services that we elsewhere determined were *also* rendered in commerce. It cannot but be concluded that *this* use of the mark — that is the building of brand identity among United States consumers — very much occurred in the United States, and indisputably so.

On our understanding of the statutory language it does not follow that since the mark has not been *rendered in commerce* in the United States it is equally fair to say that the mark has not been *used in the United States*, when in fact it has been widely used in the United States for advertising and marketing purposes. Unless one conflates these two elements then, one cannot fairly criticize our holding today as protecting a mark "exclusively" used in Moncaco. At most one can criticize us for providing protection to a mark used in *both* Monaco and the United States.

The dissent's different understanding of the statute and of the two elements it sets out for establishing "use in commerce" is that *both* elements of "use in commerce" must occur within the geographic borders of the United States, a merging of the contents of the two elements that is not provided for by the statute. The dissent believes it can defend this proposition on the basis that many courts over the years have said that "use" must occur in the United States in order for a mark to merit Lanham Act protection. But, a "use in commerce" whose elements occur, as here, both in the United States and abroad is not exclusive foreign use, and is not controlled by the principles of law upon which the dissent relies. Indeed, that the statute's definition of the term commerce encompasses foreign commerce (thus naturally including some services rendered outside the United States borders) points, in fact, in the opposite direction from the dissent's conclusion.

Yet we reject the dissent's interpretation of "use" not only because the statute does not suggest it, but also because the authorities to which the dissent cites for its rule that "*[b]oth* elements must occur in the United States in order to satisfy the use in commerce requirement" do not yield the precise formulation that the dissent suggests they do. While these cases support the general contention that "use" must be in the United States, they do not support the very different conclusion that *both* distinct elements of the statutory "use in commerce" definition for servicemarks must occur within the United

States. Rather, these authorities, employing the term "use" in loose and often varying ways, have either not drawn the distinction between the two elements of use that are required in the statutory analysis of *servicemarks*, or have drawn the distinction but then have not stated that *both* elements of a servicemark's use must occur within the geographic confines of the United States.

Indeed, of the many cases the dissent cites, only *two* provide the support it seeks. Both of those cases decided by the TTAB, *Mother's Restaurant, Inc.* and *Linville II*, are unpersuasive authority to us because of their failure properly to distinguish analytically between the two distinct elements of the "use in commerce" requirement, and between the distinct content of those elements. But before we reject the reasoning of those two cases, we first owe the dissent a run-down on the other cases it presents as contrary precedent to our decision today.

The dissent suggests that the Federal Circuit opposes our rule. In particular, it points to *Person's Co. Ltd.* v. *Christman*, 900 F.2d 1565 (Fed. Cir. 1990). In *Person's*, however, the court faced the question of whether a Japanese manufacturer of clothes that had sold its clothes in Japan, *and had never used or displayed its mark to advertise or sell its products in the United States*, could establish priority of use in the mark *based on its Japanese operations*. Though the record did disclose a single occurrence when a United States citizen purchased goods in Japan from the company, thus arguably meeting the commerce requirement, no evidence whatsoever was proffered that the company had in any way used or displayed its mark to advertise or sell its product to United States consumers. Thus it was that only "foreign use" (*i.e.*, the foreign advertising of its product to foreign consumers) of the mark existed.[7] Of course, the court's rejection

---

[7]As will quickly be seen in the analysis that follows, courts have long loosely used the term "foreign use." Sometimes the term signals that the commerce at issue does not qualify as commerce that Congress may regulate, and that thus there is only "foreign use." Sometimes the term signals that, though qualifying commerce is present, the mark owner has not used or displayed the mark in advertising and sales efforts directed at United States consumers, and thus that there is only "foreign use." And sometimes, the term signals that neither qualifying commerce, nor quali-

of *such* foreign use in no way reflects upon the case before us today
where SBM did use and display its mark to advertise or sell its ser-
vices in the United States to United States consumers.[8]

The dissent also points to *Imperial Tobacco Limited* v. *Philip Mor-
ris, Inc.*, 899 F.2d 1575 (Fed. Cir. 1990), as its justification. But, just
a glance at the first paragraph in the first section of that opinion tips
off the careful reader that that court too understood that varied forms
of commerce could support trademark protection:

> No use of the mark in commerce in *or with* the United States
> was alleged.

*Id*. at 1577 (emphasis added). By this factual notation, the court made
clear, albeit by implication, that commerce in the United States is not

---

fying use or display in advertising or sales, is present, and thus that there
is only "foreign use."

Of equal importance, the Lanham Act provides different statutory defi-
nitions of use for marks attached to goods and services. Thus, the term
"use" when used in the context of a case involving goods bears one
meaning, and, when used in the context of a case involving services,
bears another.

To the extent that this prior imprecision underlies the dissent's reason-
ing, its approach to the question is somewhat understandable. However,
after today, such imprecision can no longer, in this circuit, cause
improper decision of these difficult cases.

[8]The dissent suggests that our distinguishing of *Person* must be wrong
because application of our rule to the facts of the *Person* case would
result in a different outcome than the Federal Circuit reached in that case.
*See post* at 48. That is not correct. The statutory provision we apply
today is directed solely and specifically to *services* and to evaluating
what constitutes use in commerce for servicemarks. We would not apply
our interpretation of the statutory provisions addressing services to a case
involving goods. We only examine *Person*, and the other cases we
address that involve goods instead of services, in order to demonstrate
that the dissent's importation of language about "foreign use" from those
cases into the case at bar does not result, *when applied within the ser-
vices construct*, to the absurd results that the dissent suggests it would.

the only commerce that can satisfy the Act, but that commerce with the United States is also implicated.

The analysis that follows then confirms that the court was not there crafting a rule requiring both elements of "use in commerce" to occur in the United States. The court faced a claim by a United Kingdom mark owner that it had not abandoned its mark's United States registration (obtained under the Lanham Act's provision allowing registration of foreign marks employed exclusively in foreign use). The mark owner claimed that either its intent to employ the mark in exclusively United States use (*i.e.*, its claimed intent to sell goods in the United States to United States citizens), or its existent exclusively foreign use (*i.e.*, its selling and advertising of goods to foreigners in foreign lands) could satisfy the Act's ongoing use in commerce requirement. Faced with these two claimed uses, the court said, "the terms 'use' and 'nonuse' mean use and nonuse in the United States[,]" *id*. at 1579, thus holding that the exclusively foreign use the mark owner relied on could not satisfy the Act, and proceeding only to inquire whether the claimed intent to employ the mark in exclusively domestic use had been established.

*Imperial Tobacco*'s "use in the United States" principle, then, presents a distinction between two particular types of uses: one exclusively domestic, one exclusively foreign. And, just as with *Person's*, the "use" (exclusively foreign) that *Imperial Tobacco* determined cannot support protection is different from the use at issue here, where the mark is both used in advertising and displays in the United States and attached to services rendered in qualifying commerce overseas.

The dissent also argues that the appeal of the TTAB's decision in *Linville II*, *Rivard* v. *Linville*, 133 F.3d 1446 (Fed. Cir. 1998) (*Rivard II*), qualifies as relevant Federal Circuit precedent on this issue. However, such is not the case. The circuit court's holding in that case, however, can only be understood after explication of the case's procedural history.

First, the TTAB, in *Linville* v. *Rivard*, 26 U.S.P.Q.2d 1508 (TTAB 1993) (*Linville I*), addressed a petition to cancel a mark owner's registration on summary judgment. As in *Imperial Tobacco*, the mark owner acquired Lanham Act registration by relying on the Act's pro-

vision for registration of foreign marks. The mark owner was Canadian and used the mark on his Canadian beauty salons. He also engaged in some advertising to United States consumers, and had some United States clientele. The Board concluded that these facts did not constitute use in commerce because the alleged qualifying commerce at issue (selling to United States consumers) was not qualifying commerce.

On appeal to the Federal Circuit, the court, *in an unpublished decision*, agreed with the Board's conclusion that use in commerce had not been established, *but not on the basis of the Board's decision*, and in fact without any consideration of whether selling to United States consumers constituted qualifying commerce, or whether use in commerce was established when such was combined with a use in United States advertising. Instead, assuming that exclusively Canadian use was at issue, the court relied entirely on its holding from *Imperial Tobacco*. *See Rivard* v. *Linville*, 11 F.3d 1074, 1993 WL 472795 at 2 (*Rivard I*). That the court never considered the mark owner's claim that his servicing of United States consumers and his United States advertising constituted use in commerce is made apparent by the fact that the court nowhere mentions those facts.

Despite agreeing with the Board's ultimate disposition of the use in commerce question, the court vacated and remanded the Board's decision on other grounds. On remand, in *Linville II*, the Board reiterated its exact *Linville I* holding as to the use in commerce issue. That is, it again concluded that the sale of services to United States consumers was not qualifying commerce.

Following *Linville II* appeal was again taken, and *Rivard II*, the case on which the dissent relies, resulted. In that decision, the circuit court affirmed the judgment of the Board as to the use in commerce question, but again, not on the Board's reasoning and without any consideration of whether servicing United States consumers constituted qualifying commerce. Instead, the court omitted the relevant facts (again) and solely relied on its prior unpublished opinion.[9] Thus,

---

[9]"Linville established a *prima facie* case that Rivard abandoned the ULTRACUTS mark because he did not use it in connection with hair dressing and beauty salon services in the United States during the relevant time period. 31 U.S.P.Q.2d at 1220." 133 F.3d at 1449.

the Federal Circuit in *Rivard II* only reiterated its holding from *Rivard I* (unpublished) and thus likewise only reiterated the principle from *Imperial Tobacco*, which principle, as we demonstrate above, is inapplicable to the case before us today.

The dissent would also rely on Fifth Circuit precedent to overcome our reasoning. That decision, *Fuji Photo Film Co., Inc.* v. *Shinohara*, 754 F.2d 591 (5th Cir. 1985), has no bearing here for the same reasons as we rejected *Person's*. *Fuji* involved two Japanese companies, formed in 1919 and 1934, respectively. Both manufactured and sold products within Japan. Beginning in 1967 and 1954, respectively, the two companies sold their products in the United States. The *Fuji* court said that the companies' Japan operations — that is, their manufacturing and selling products to Japanese locals as they had been doing for generations — did not figure into the trademark analysis. Just as in *Person's*, *such* foreign use (*i.e.*, non-qualifying commerce *and* the foreign use and display of the mark to advertise and sell products to foreign consumers) is not what is before us today.

The dissent would also have it that we are now in conflict with the Second Circuit on this issue as well. For the reasons given above, we reject the dissent's contentions as to *Buti*. *See supra* pp. 15-16. But so, too, do we reject the dissent's claim that *La Societe Anonyme des Parfums le Galion* v. *Jean Patou, Inc.*, 495 F.2d 1265 (2nd Cir. 1974), bears on this case. In that case, the court faced a trademark claim by a foreign perfume manufacturer against a domestic perfume manufacturer. The plaintiff initially asked the court to rule that it had United States trademark rights in its mark, which it had attached to products it manufactured abroad, had advertised abroad to foreigners, and had sold abroad to foreigners. The court found that *such* foreign use (*i.e.*, again, non-qualifying commerce and foreign use and display of the mark to advertise and sell the product to foreign consumers) could not create trademark rights in the plaintiff. Again, such foreign use is not what is at issue today.[10]

---

[10]The dissent would also have it that *The Morningside Group Limited* v. *Morningside Capital Group, LLC*, 182 F.3d 133 (2nd Cir. 1999), supports its position. However, that case did not involve anything like the case before us. It involved services provided in the United States, and so

Closer to home, the dissent suggests that a Fourth Circuit case on trade dress, *CBS, Inc.* v. *Logical Games*, 719 F.2d 1237 (4th Cir. 1983), though not controlling, ought provide parallel reasoning by which we should abide. Not only does that case not support the dissent's position, but explicit language within it in fact points toward our decision today. That case involved a trademark infringement suit by the distributor of Rubik's Cube, against a former distributor of the product who sold his copied version under the trademark, Magic Cube. The court rejected the defendant's claim that, *based on the third-party manufacturer's foreign production of and foreign sale to foreign consumers* of the product, he somehow was due trade dress rights in the product, accruing at the time that he imported the product into the United States. *Such* foreign use by the third-party, foreign manufacturer could not lead to trade dress rights, the court said. *Id.* at 1239. Again, such "foreign use" is not what is at stake here.

Perhaps more illuminating from the *CBS* decision is the following language the dissent chooses not to highlight, which language seems in fact to portend something akin to the very case before us today:

> [F]actual situations can be imagined in which extensive — especially reiterated — purchase abroad and marketing in the United States might operate to create in the American importer trade dress rights in the United States for a format employed elsewhere by the foreign manufacturer.

*Id.*

---

the court distinguished it from *Buti* with the language the dissent cites. We whole-heartedly agree with the principle enunciated by that court in its distinguishing of *Buti*, particularly with its statement of the governing principal: "Mere advertising and promotion of a mark in this country are not enough to constitute "use" of the mark "in commerce," so as to bring the activity within the scope of the Lanham Act." The whole point, of course, is that with respect to services, further inquiry must be made as to whether such use (advertising and promotion in the United States) is conjoined with qualifying commerce. Thus, ultimately in *Morningside Group*, the court did provide the mark owner with Lanham Act protection.

The dissent would also rely on a long-line of decisions from the TTAB, to which, the dissent says, proper deference would result in our adoption of its suggested disposition. However, as noted above, only two of the cases cited are on point. The remainder are inapposite for much the same reason as the circuit court cases discussed above are inapposite.[11]

---

[11]In *Techex, Ltd.* v. *Dvorkovitz*, 220 U.S.P.Q. 81 (TTAB 1983), the Board considered whether a British company that "resells the equipment [it purchases from an American company] to its European customers and provides warranty services to them," and that only intentionally advertises to those European consumers, had United States trademarks rights as a result of that "foreign use." The board said no. Once more, a different foreign use was at issue than is at issue today.

In *Stagecoach Properties, Inc.* v. *Wells Fargo & Co.*, 199 U.S.P.Q. 341 (TTAB 1978), the Board considered whether a domestic company that owned a mark, but had not at all used it to advertise or identify resorts it operated in Mexico, had Lanham Act trademark rights in that mark as a result of the fact that its resorts engaged in qualifying foreign commerce. The Board, wisely we think, said no. In reaching its decision it said, "*There is [ ] no evidence to show that the Colorado company used a design of a stagecoach, in any form, as a sign or mark to identify its services* at [its Mexican resorts]." *Id.* at 349 (emphasis added). Thus, the Board rejected the contention that the mark was used or displayed in the advertising or sale of those services to United States consumers. The Board did go on in the next sentence as follows: "In addition, applicant's argument ignores the fundamental rule that activity outside of the United States is ineffective to create rights in marks in the United States." But we do not think that this latter statement can be understood, as the dissent would have it, to be a considered holding that where a United States firm sells its foreign resort services to United States consumers *and* advertises its services to those United States consumers under the mark, that such a mark would merit no Lanham Act protection. Yet, this is indeed the result to which the dissent's reasoning tends. Given the immediately preceding sentence, we read this language to say simply what all the other courts in the cases we have been reviewing thus far have said: that "foreign use" of marks *as so understood* (that is as foreign sale *and/or* foreign marketing to foreigners) does not establish Lanham Act protection.

In *Oland's Breweries* v. *Miller Brewing Co.*, 189 U.S.P.Q. 481 (TTAB 1976), the Board dealt with a case in which it *explicitly found there was no foreign commerce* (*i.e.*, that commerce that Congress may regulate). *See id.* at 488 ("[T]he record shows that opposer has not sold any beer

Thus we are left with only two TTAB cases remaining from those proposed by the dissent that actually bear on the issue before us today. We recognize that those cases, *Rivard* and *Mother's Restaurant, Inc.*, are due "great weight" from us. *See post* at 42. But great weight certainly does not mean obeisance, and it does not even mean deference, particularly in the face of overwhelmingly clear statutory language that leads us to a contrary conclusion. And that there is no

---

under the mark "SCHOONER" in commerce which may lawfully be regulated by Congress[.]"). Based on this lacking ingredient to Lanham Act protection, the Board found that the mark had been abandoned. Then, and only then, did the Board inquire as to whether advertising the mark owner had done in the United States was *evidence of an intent* not to abandon the mark. Thus, it is not a case, as the dissent would have it, where the presence of foreign commerce, and associated United States-based advertising was not sufficient to justify trademark protection. Instead, the mark was abandoned because there was simply no commerce at all.

Lastly, in *Sterling Drug, Inc.* v. *Knoll A.G. Chemische Fabriken*, 159 U.S.P.Q. 628 (TTAB 1968), the Board considered whether a German pharmaceutical manufacturer had Lanham Act rights to its mark in the United States where the manufacturer had not advertised in the United States or to United States consumers, though some United States consumers had been treated with the pharmaceutical in Germany. Again, the obvious element that is missing here is the use and display of the mark to advertise or sell the product to United States consumers engaging in qualifying foreign commerce. *See id.* at 630 ("Though German publications containing applicant's advertisements of "TALUSIN" or references to that mark were received in the United States, *there is no indication in the record that these publications obtained such circulation in the United States as to make the relevant public for applicant's goods, physicians and pharmacists, aware of applicant's use of "TALUSIN."* In other words, the advertising in a foreign publication which may occasionally be found in some library in the United States does not create protectible rights in the advertised mark in the United States." (emphasis added)). That the Board would in this case, as in so many others, note that such "foreign use" (*i.e.*, here, the foreign marketing to foreign consumers) is not sufficient to establish Lanham Act rights is entirely unobjectionable in our eyes, and again deals with different "foreign use" than that which is at issue here.

other precedent to support these two decisions by the TTAB simply confirms all the more our decision to reject its reasoning.

In *Linville II*, the Board considered whether a Canadian beauty salon that solely operated Canadian facilities, engaged in certain Canadian advertising that reached across the border into the United States, had distributed promotional materials at a single county fair in the United States, and had at times serviced United States customers, had "used" its mark under the terms of the Lanham Act. *See Linville II*, 41 U.S.P.Q.2d at 1735-36. Faced with these facts, the Board concluded that *qualifying commerce* was not present, and so denied the mark any protection. In its opinion, the Board reincorporated its initial analysis in *Linville I. See Linville II*, 41 U.S.P.Q.2d at 1736 ("*For the reasons set forth by the Board in the summary judgment decision*, we find that the above activities neither individually nor collectively constituted use of the ULTRACUTS mark in commerce[.]").[12]

The *Linville I* opinion moves seamlessly between its rejection of the presence of qualifying commerce, to a rejection of "use" of the mark based on that lack of qualifying commerce, thus conflating the two inquiries and giving its opinion the superficial appearance of having rejected a claim similar to that at issue here.

> We reject respondent's argument that, through its advertising, he has used the mark ULTRACUTS in the United States continuously since 1986. *Although the definition of use in commerce in the statute refers to a mark being "used or displayed in the sale or advertising of services," the definition continues with the requirement that*[: "]the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.["] *Respondent also argues that his services are rendered in commerce* because of the effect on commerce which is created by his

---

[12]The Board in *Linville II* proceeded to reiterate nearly verbatim its reasoning from *Linville I*. We analyze the language from *Linville I* on which the Board relies, though the same conclusions apply to its duplicative reasoning in *Linville II*.

business, i.e., customers must travel from the United States to Canada in order to obtain his services, and therefore the customers travel in commerce. . . . *[The cases respondent cites] in support of his position . . . involved services which were actually rendered in the United States*, i.e., a restaurant located in Tennessee and a hotel in New York which attracted *interstate* travelers. Those fact situations were manifestly different from that presented here, where during the relevant time period respondent's hair salons were located only in Canada.

. . . .

*The mere fact that residents of the United States have availed themselves of respondent's services while in Canada does not constitute technical trademark use* of respondent's service mark which is sufficient to obtain or maintain a registration in the United States.

26 U.S.P.Q.2d at 1512 (emphasis added).

Having determined that no qualifying commerce was present, the Board did not reject a position similar to that present here. And regardless of whether we approve or disapprove of the Board's Commerce Clause analysis, it is readily apparent that their holding, rejecting trademark protection where no qualifying commerce is present, comports with ours.

In *Mother's Restaurants*, the Board considered whether a Canadian restaurant that engaged in "advertising and promotional efforts directed to Americans entering Canada from the United States along tourist routes," had, *by that advertising*, created Lanham Act rights under that mark. The Board, relying fully on a decision of the District Court for the Western District of New York, said:

[W]e decline to hold that opposer's promotional activities in Canada regarding "MOTHER'S" and "MOTHER'S PIZZA PARLOUR & SPAGHETTI HOUSE" prior to 1976 resulted in superior rights in said marks in the United States so as to

> preclude applicant from registering a confusingly similar mark. Rather, it is our view that prior use and advertising of a mark in connection with goods and services marketed in a foreign country (whether said advertising occurs inside or outside the United States) creates no priority rights in said mark in the United States as against one who, in good faith, has adopted the same or similar mark for the same or similar goods or services in the United States prior to foreigner's first use of the mark on goods or services sold and/or offered in the United States. . ., at least unless it can be shown that the foreign party's mark was, at the time of the adoption and first use of a similar mark by the first user in the United States, a "famous" mark[.]

*Id.* at 1048.

We are unpersuaded that this conclusory determination should govern our analysis. Most importantly, the Board never addressed the question of whether commerce that Congress could regulate was at issue. While it appears that such was the case from the factual description provided, the Board suggests that the only relevant question was whether "promotional activities in Canada" could create a right in a mark. By this formulation of the Lanham Act standard, the Board seems, like the dissent, to conflate the "commerce" element of the "use in commerce" requirement with the "use or display of the mark" element of that same requirement.

The conflation becomes most apparent in the Board's next declaration that such Canadian (or even it says, United States) promotions *attached to Canadian trade* "create[ ] no priority rights in said mark in the United States." *Id.* It thus appears that the Board, while *first* measuring the mark owner's "use" of the mark by promotional activity, *then* measures it by whether it is attached to interstate commerce, never pausing to inquire as to the subtleties of the qualifying commerce requirement. *Compare id.* ("[W]e decline to hold that opposer's *promotional activities in Canada* . . . resulted in superior rights[.]"), *with id.* ("[A]dvertising of a mark[, wherever occurring,] *in connection with goods and services marketed in a foreign country* . . . creates no priority rights in said mark in the United States[.]").

In contrast, the proper inquiry in such circumstances is to evaluate first whether the commerce to which both parties claim their mark is attached may be regulated by Congress, and then to evaluate at what point in time the mark owners' began to use or display the mark in the advertising and sale of *those* qualifying services *to the qualifying consumers*. Our disagreement with the Board's analytical approach in *Mother's Restaurant* convinces us that our circuit's law will be better served if we hew to the language of the statute and apply the Lanham Act with a careful eye toward, and an appreciation of, the two distinct elements of the "use in commerce" requirement.

Indeed, that it is not enough for a mark owner to engage in qualifying commerce to create rights in his mark, and that it is not enough for a mark owner to use or display the mark in the advertising or sale of services to create rights in his mark, is critical. This point cannot be missed else the holding we reach today will indeed be distorted, as the dissent's misreading of it illustrates.[13] Rather, a mark owner must *both* engage in qualifying commerce *and* use or display its mark in the sale or advertising of these services to the consumers that engage in that qualifying commerce. Of course, such was not found by the circuit courts or the Board to be the case in any of the decisions the dissent cites. While *Rivard* and *Mother's Restaurant may* have presented such facts, the Board in *Rivard* explicitly disclaimed that foreign commerce was present, and in *Mother's Restaurant* it did not inquire into these distinct elements so that we could even say with confidence that there the two distinct elements of the "use in commerce" requirement were, or were not, in fact met.

---

[13]*See post* at 39 ("The majority determines that [SBM's casino] services 'constitute trade with a foreign nation that Congress may regulate under the Commerce Clause.'" *Based on this determination*, the majority accords SBM, the holder of the foreign mark, "Casino de Monte Carlo," eligibility for trademark protection[.]"). Of course, that SBM's service are qualifying commerce did *not* terminate our analysis of whether SBM had used its mark in commerce. The second step was to adjudge whether SBM's massive advertising campaign in the United States, directed to United States consumers and intended to spur the qualifying commerce that is in question, constituted a use or display of the mark in the advertising of SBM's qualifying services.

As to the dissent's last principal basis for its objection to our holding today, it is one of policy. The dissent fears that we are undoing all of the good of our country's trademark laws. *See post* at 45-46. We do concede that policy is not our forte. But, we cannot help but note that since avoidance of consumer confusion is the ultimate end of all trademark law, this case presents a paradigmatic situation in which we may see our laws working, as intended, to reduce consumer confusion.

Indeed, the very fact that the Board in *Mother's Restaurant* would acknowledge that foreign trademarks deemed "famous" can, with neither a demonstrated connection to qualifying commerce nor a demonstrated use or display of the mark in order to advertise or sell services in such qualifying commerce, enjoy Lanham Act protection, *see Mother's Restaurant*, 218 U.S.P.Q. at 1048, illustrates the very real interest that our trademark laws have in minimizing consumer confusion, so that our economy may enjoy the greatest possible of efficiencies and confirms that trademarks developed overseas can themselves lead to such undesirable and inefficient consumer confusion here at home.

Ultimately, though, if SBM's mark merits protection under the statute, we must provide it to them.[14] We do not know that this is "reverse imperialism," *see post* at 46, but we do know that the law requires that we permit mark owners like SBM to petition our courts for protection. And we know as well that if such owners, upon their petition, can

---

[14]The dissent also implies that since SBM could register its mark in the United States, we should not be overly concerned with providing them the right of Lanham Act protection we today provide them. *See post* at 43-44. That fact is, in our minds, as irrelevant here as it would be in a case involving a domestic manufacturer who, having sold products in interstate commerce under an unregistered mark, sought the protection of the Lanham Act from an infringer.

It is inconceivable that courts would interpret the Lanham Act to punish such mark owners for failing to register their mark *where* their mark otherwise meets the statutory requirements for protection. Here, as much, it is inconceivable that SBM's registration status should affect our analysis of whether or not its mark qualifies for protection under the plain text of the statute.

demonstrate that they meet the requirements of the statute, that they are then *entitled* to protection, and that it is beyond us to refuse it to them.

## IV.

Having determined that the district court properly ruled that SBM's mark was protectible under the Lanham Act, we turn next to review its conclusion that its mark was infringed by the plaintiff companies' activity.

To prove infringement of a protectible trademark, a trademark owner must demonstrate that the infringer's use of the mark is likely to cause consumer confusion. *See Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 930. On the record before us we cannot conclude that the district court committed clear error in determining that the plaintiff companies' use of the mark would cause consumer confusion. The domain addresses in question, their use of pictures and renderings of the actual Casino de Monte Carlo, and the web sites implying that they provided online gambling as an alternative to their non-existent Monte Carlo-based casino all support the conclusion that ordinary consumers would be confused. The district court's grant of summary judgment to SBM for trademark infringement under § 1125(a) was therefore justified.

## V.

The plaintiff companies lastly argue that the district court's injunctive remedy, ordering transfer of 43 domain names to SBM, was overbroad and vague, and that less burdensome remedies were available. But the injunctive order was proper under § 1125(d)(1), the anticybersquatting provision that the court concluded the plaintiff companies had violated, since that provision expressly provides domain name transfer as remedy. The plaintiff companies do not challenge the district court's determination under § 1125(d)(1), other than by their objection that the "Casino de Monte Carlo" mark is not protectible, which contention we reject above. In light of SBM's protectible interest in the mark, and the plaintiff companies' failure to challenge the judgment under § 1125(d)(1) on other grounds, we conclude that the court's provision of injunctive remedy was proper.

*CONCLUSION*

For the reasons provided herein, the judgment of the district court is affirmed.

*AFFIRMED*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

The majority reaches the unprecedented conclusion that an entity's use of its foreign trademark solely to sell services in a foreign country entitles it to trademark protection under United States law, even though the foreign mark holder has never used or registered its mark in the United States. In my view, the majority errs in holding that the protection of United States trademark law extends to a mark used exclusively in Monaco by a company incorporated there. For this reason and others set forth within, I respectfully dissent.

I.

Under United States law, the holder of an unregistered mark must demonstrate "use in commerce" of that mark in order to be eligible for trademark protection. The Lanham Act provides that "[a] mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C.A. § 1127 (West Supp. 2003). Thus, there are two essential elements that must be present to constitute "use in commerce" for Lanham Act purposes: (1) advertising that employs the mark and (2) the rendering of services to which the mark attaches. Neither alone is sufficient. This two-pronged statutory meaning of "use in commerce" is what I refer to when I say that SBM did not "use" its mark in commerce because it did not "use" the mark in the United States.[1] Prior to today's holding, all existing

---

[1]This two-pronged meaning of "use" originated in the pre-Lanham Act trademark cases. *See, e.g., Trade Mark Cases*, 100 U.S. 82, 94-95 (1879). The Lanham Act's "use in commerce" requirement draws directly on this earlier understanding. *See Zazu Designs v. Loreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992). In a case presenting facts almost iden-

authority, employing precisely this same two-pronged understanding of use, has similarly concluded that use in the United States is necessary to meet the Lanham Act's use in commerce requirement. None of this authority has ever suggested that if one element of the use in commerce requirement — advertising — takes place in the United States while the other — the rendering of services — occurs outside the United States, there has been use in the United States. Both elements must occur in the United States in order to satisfy the use in commerce requirement.

Indisputably, SBM has satisfied the first element of the use in commerce requirement, for no one questions that SBM employed the Casino de Monte Carlo mark in the United States to advertise and promote the gambling services that it provides exclusively at its casino in Monaco. This is not and has never been a case about advertising. Rather, the question here is whether the second element of the use in commerce requirement has been satisfied, *i.e.* have the services that give rise to the Casino de Monte Carlo mark been rendered in commerce of the United States. The majority holds that they have and thus accords SBM's mark eligibility for trademark protection under United States law. I believe, however, that because SBM has not rendered its casino services in the United States, it has not satisfied the statutory use in commerce requirement in a manner sufficient to merit protection under the Lanham Act. Subsection I.A provides my analysis of this question; subsection I.B sets forth my response to the majority's efforts to rebut that analysis.

A.

In this case, some United States citizens purchased "casino services" in Monaco from the Societe des Bains de Mer et du Cercle des

---

tical to the case at hand, the Second Circuit clearly recognized this understanding of "use" and its grounding in earlier Supreme Court doctrine. *See Buti v. Perosa, S.R.L.*, 139 F.3d 98, 103 (2d Cir. 1998) ("Under this rule, therefore, Santambrogio's mere advertising of the Fashion Cafe mark, standing alone did not constitute 'use' of the mark within the meaning of the Lanham Act." (citing *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918)).

Estrangers a Monaco (SBM), a "subject of a foreign nation." The majority determines that those services "constitute trade with a foreign nation that Congress may regulate under the Commerce Clause." *Ante* at 14. Based on this determination, the majority accords SBM, the holder of the foreign mark, "Casino de Monte Carlo," eligibility for trademark protection under the Lanham Act for that mark even though SBM has *never* used the mark in the United States.

SBM has not argued, and the district court did not hold,[2] that the mark was entitled to protection under the Lanham Act simply because SBM used it to sell gambling services in Monaco to United States citizens. Nor did SBM argue, or the trial court hold, that these sales of gambling services in Monaco to United States citizens constitute foreign trade that has been regulated by Congress under the Lanham Act. Indeed, prior to today, no court, administrative agency, or treatise has ever espoused or adopted this theory.

Rather, it has long been recognized that use of a foreign mark in a foreign country creates no trademark rights under United States law. As the foremost trademark authority has explained, "[f]or purposes of trademark rights in the United States, 'use' means use in the United States, not use in other nations." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 17.9 (4th ed. 2000) ("McCarthy"); *see also* 3 Rudolf Callman, The Law of Unfair Competition, Trademarks and Monopolies § 19.24 (4th ed. 1998) ("Callman") (noting that "[t]he use required under United States law as the foundation of trademark rights must be use in this country and not abroad . . . . It is well settled that foreign use creates no trademark rights in the United States.").[3]

---

[2]The majority properly rejects the only rationale offered by SBM (and adopted by the district court) for finding the mark used in United States commerce for Lanham Act purposes, *i.e.* that advertising in the United States combined with the booking of reservations to SBM's various resorts through SBM's New York office sufficed to meet the use in commerce requirement. *See ante* at 7-9.

[3]This principle, that use in the United States provides the foundation for U.S. trademark rights, is a corollary of the well-established principle that trademark rights exist in each country solely as determined by that country's law. *See Ingenohl v. Olsen & Co., Inc.*, 273 U.S. 541, 544

Until today, every court to address this issue has held that use of a *foreign trademark* in connection with goods and services sold *only* in a foreign country by a foreign entity does not constitute "use of the mark" in United States commerce sufficient to merit protection under the Lanham Act. As the Federal Circuit explained in rejecting the contention that a Japanese mark holder's use of a trademark solely in Japan in connection with goods sold to a United States citizen constituted use of the mark in commerce for Lanham Act purposes:

> Such foreign use has no effect on U.S. commerce and cannot form the basis for a holding that appellant has priority here. The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme.

*Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1568-69 (Fed. Cir. 1990); *accord Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985); *Fin. Matters, Inc. v. Pepsico, Inc.*, 806 F. Supp. 480, 484 (S.D.N.Y. 1992); *see also La Societe Anonyme des Perfums Le Galion v. Jean Patou*, 495 F.2d 1265, 1270 n.4 (2d Cir. 1974) ("[I]t is well settled that foreign use [of a trademark] is ineffectual to create trademark rights in the United States."). Although we have never before directly addressed this question, we

---

(1927) ("A trade-mark started elsewhere would depend for its protection in Honkong upon the law prevailing in Honkong and would confer no rights except by the consent of that law."). The United States has long committed itself to this territoriality principle by joining international agreements based on it. *See, e.g.*, Paris Convention for the Protection of Industrial Property, March 20, 1883, art. 6(3), *available at* http://www.wipo.int/clea/docs/en/wo/wo020en.htm (last visited March 20, 2003) — a convention that the United States joined in 1883. The majority builds its contrary thesis on the unremarkable proposition that for Lanham Act purposes "commerce" is defined as "all commerce which may lawfully be regulated by Congress." 15 U.S.C.A. § 1127 (West 1998 and Supp. 2002). What the majority overlooks is that to the extent Congress can regulate sales of goods and services by foreigners, bearing foreign marks, in foreign nations, it has chosen to do so by providing in the Lanham Act for compliance with international agreements based on the territoriality principle. *See, e.g.,* 15 U.S.C. § 1126(b) (West 1998).

have "accept[ed] the assertion . . . that 'trade dress use in foreign countries does not create protectible trade-mark rights in the United States.'" *CBS, Inc. v. Logical Games*, 719 F.2d 1237, 1239 (4th Cir. 1983); *cf. Buti v. Perosa*, 139 F.3d 98, 103 (2d Cir. 1998) (noting that plaintiff conceded that "Congress has no constitutional authority to regulate the operation of the Fashion Cafe in Milan" perhaps in "recognition of the fact that . . . registration and use of the Fashion Cafe name in Italy has not, given the territorial nature of trademark rights, secured it any rights under the Lanham Act").

Aside from its singularly unpersuasive attempt to distinguish *Buti*,[4] the majority ignores all of this authority. The majority also ignores the fact that courts have uniformly rejected its precise argument, *i.e.*, use of a foreign mark in a foreign country somehow grants the foreign holder of the mark *priority* over one who uses the mark first in the United States. *See, e.g.*, *Person's*, 900 F.2d at 1567-69; *Fuji Photo*

---

[4]Contrary to the majority's suggestion, *ante* at 15-16, the plaintiff's concession in *Buti* that it did not sell cafe services in "foreign trade" with the United States, does not render *Buti* "unpersuasive" here. This is so because SBM has made — albeit implicitly — exactly the same concession. Indeed, SBM does not argue that its sale of services abroad constitutes use in the "foreign trade" of the United States. Rather, like the plaintiff in *Buti*, SBM claims only that its U.S. advertisement and promotion activities constitute *use in the United States*. *See* Brief of Appellees at 19 (arguing that record provides "evidence of its mark's use *in the United States*"); 22 (same); 23 (same); *see also id.* at 28 (arguing that application of famous marks doctrine entitles it to trademark protection "as an alternative to a showing of 'use' in the United States."). Thus, in a context very similar to that at hand, the Second Circuit in *Buti* recently indicated its agreement with the rule that rendering services in a foreign country does not suffice to establish use in commerce for Lanham Act purposes. Moreover, *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133 (2d Cir. 1999), decided a year after *Buti*, makes clear the Second Circuit's intent. There, in the course of holding that a mark claimant met the "use in commerce" requirement by "conduct[ing] material aspects of its investment services in the United States," the Second Circuit distinguished *Buti* as a case "in which the service mark claimant did not provide its actual business services (the conduct of a restaurant business) in the United States, but only advertised and promoted those services in the United States." *Id.* at 138.

Film, 724 F.2d at 599; *Fin. Matters*, 806 F. Supp. at 484-85; *Johnson & Johnson v. Diaz*, 339 F. Supp. 60, 63 (C.D. Cal. 1971).

Like the courts, the Trademark Trial and Appellate Board (TTAB), whose decisions are entitled to "great weight," *Buti*, 139 F.3d at 105 (internal quotation marks omitted); *see also In re Dr. Pepper Co.*, 836 F.2d 508, 510 (Fed. Cir. 1987), has also long rejected this theory, concluding instead that "[p]riority of right in a trademark in the United States depends on priority of use in the United States and is not affected by priority of use in a foreign country." *Sterling Drug Inc. v. Knoll A.-G. Chemische Fabriken*, 159 U.S.P.Q. 628, 630 (TTAB 1968); *see also Techex Ltd. v. Dvorkovitz*, 220 U.S.P.Q. 81, 83 (TTAB 1983); *Mother's Restaurants Inc. v. Mother's Other Kitchen, Inc.*, 218 U.S.P.Q. 1046, 1048 (TTAB 1983); *Stagecoach Properties, Inc. v. Wells Fargo & Co.*, 199 U.S.P.Q. 341, 349 (TTAB 1978); *see also* McCarthy § 29.3 ("Prior use of a trademark in a foreign country does not entitle its owner to claim exclusive trademark rights in the United States as against one who used a similar mark in the U.S. prior to entry of the foreigner into the domestic American market.")[5]

Nor is the rule any different when, as here, the mark is used in a foreign country in connection with services or goods *sold to United States citizens. See, e.g.*, *Person's*, 900 F.2d at 1567-69 (rejecting argument that use of trademark on goods sold in Japan by Japanese company to a U.S. citizen could establish priority rights against person using mark first in the United States); *Mother's Restaurants*, 218 U.S.P.Q. at 1047-48 (rejecting argument that use of trademark on restaurant services provided in Canada by Canadian entity to Americans created "priority rights in said mark in the United States"); *Stagecoach Properties*, 199 U.S.P.Q. at 349 (rejecting argument that use of

---

[5]Even if the plaintiff companies knew of SBM's use of its foreign mark in connection with services rendered in Monaco, this does not render the plaintiff companies bad-faith users of the mark in the United States or preclude them from using the mark in the United States. *See Person's*, 900 F.2d at 1570 ("Knowledge of a foreign use does not preclude good faith adoption and use in the United States."); *accord Buti*, 139 F.3d at 106; Callman § 19.24 and cases cited therein ("[E]ven an intentional imitator may acquire domestic trademark rights if the mark he imitates is used in a foreign country.").

trademark on hotel and restaurant services provided in Mexico to "people from the United States" created rights protectible under U.S. law in part because this "argument ignores the fundamental rule that activity outside the United States is ineffective to create rights in marks within the United States"); *see also Sterling Drug*, 159 U.S.P.Q. at 630-31.

I recognize that, consistent with the Paris Convention and other international agreements, owners of foreign trademarks can obtain United States trademark protection by *registering* their marks in the United States without having to show actual prior use in this country. *See* 15 U.S.C.A. § 1126(e) (West Supp. 2002) (providing that a foreign applicant from a country with whom the United States maintains certain treaty rights can obtain a U.S. registration for a mark registered in its home country that it intends to use in U.S. commerce). But, as the majority acknowledges, SBM has not registered its mark in the United States. *See ante* at 2.[6]

Moreover, when the owner of a foreign trademark, like SBM, has properly registered its foreign mark under the Lanham Act, that registration merely entitles it to the "same national treatment as any other registrant." *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1578 (Fed. Cir. 1990). Therefore, after it has registered its foreign mark, the holder of the mark can maintain United States protection of the mark *only* if it complies with the requirements of United

[6]Of course, the Supreme Court has long held that when a United States trademark (*i.e.*, a mark used or registered in this country) is at issue, no "rule of international law" prevents the United States "'from governing the conduct of its own citizens . . . in foreign countries when the rights of other nations or their nationals are not infringed.'" *Steele v. Bulova Watch Co.*, 344 U.S. 280, 285-86 (1952) (*quoting Skiriotes v. Florida*, 313 U.S. 69, 73 (1941)). For this reason, Congress has the power, which it has exercised in the Lanham Act, to prohibit *United States* citizens from engaging in "deliberate acts" abroad which result in "[u]nlawful effects in this country," *i.e.*, infringement of a trademark *registered in the United States*. *Bulova*, 313 U.S. at 288. As the majority seems to recognize (by citing *Bulova* briefly only to distinguish it, *see ante* 15 n.6), *Bulova* offers no support for its theory, which arises from a claim by a foreign entity to United States trademark protection for a foreign mark never used or registered in this country.

States law. *Id.* at 1578-79. The Lanham Act provides that any mark owner — including the owner of a foreign mark — that discontinues use of the mark may be deemed to have "abandoned" the mark and that "nonuse" for a statutorily required period of time, now three consecutive years (formerly two consecutive years) "shall be *prima facie* evidence of abandonment." 15 U.S.C.A. § 1127 (West 1998 & Supp. 2002); *see also Emergency One, Inc. v. American Fireagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000). In this context too "'use' and 'nonuse' [of a trademark] mean use and nonuse *in the United States*." *Imperial Tobacco*, 899 F.2d at 1579 (emphasis added); *see also Rivard v. Linville*, 133 F.3d 1446, 1449 (Fed. Cir. 1998); *Oland's Breweries Ltd. v. Miller Brewing Co.*, 189 U.S.P.Q. 481, 487-88 (TTAB 1976).

Thus, even when the owner of a foreign mark has registered its mark in the United States, it will be presumed to have abandoned the mark if it does not use the mark for the statutorily required period of time *in the United States*. Use, no matter how extensive, of the mark in a foreign country during this period, does not rebut the presumption of abandonment. *See Rivard*, 133 F.3d at 1448-49; *Imperial Tobacco*, 899 F.2d at 1579; *Oland's*, 189 U.S.P.Q. at 487-88. In *Oland's*, for example, although a Canadian company used its mark extensively on beer sold in Canada *to United States citizens*, because it did not sell any beer with this mark *in the United States* during the required statutory period, "a prima facie case of abandonment . . . [was] shown." *Oland's*, 189 U.S.P.Q. at 488.

Indeed, in recent years one of our sister circuits has considered and rejected the majority's theory in the context of facts far more favorable to the owner of the foreign trademark. *See Rivard v. Linville*, 133 F.3d 1446 (Fed Cir. 1998), *aff'g*, 41 U.S.P.Q.2d 1731 (TTAB 1997). There, an owner of thirty-seven hair styling salons in Canada (the majority of which were within one hour of the U.S. border) maintained that although he had not used his mark in the United States itself, he had nonetheless "engaged in activities . . . which constitute use of the mark in [United States] commerce." 41 U.S.P.Q.2d at 1735.

Specifically, the owner maintained that far-reaching Canadian advertisement that extended into the United States; distribution of coupons, gift certificates, and balloons in the United States; and, most importantly here, purchase by a "'significant' United States clientele"

of the salon services in Canada constituted use of his mark in the United States sufficient to merit protection under the Lanham Act. The TTAB concluded that "the above activities neither individually or collectively constituted use of the . . . mark in commerce," and specifically rejected the owner's "argument" that "travel of customers from the United States to [his] Canadian salons" meant that those services had been rendered "in commerce" because "activity outside the United States does not create rights in marks within the United States." *Id.* at 1735-37. The Federal Circuit affirmed, explaining that "a *prima facie* case" had been established that the owner abandoned his mark "because he did not use it in connection with hairdressing and beauty salon services in the United States during the relevant time period." 133 F.3d at 1449.

In sum, as the cases and commentary make clear, a mark cannot satisfy the use in commerce requirement sufficient to merit protection under the Lanham Act without a claimant showing use in the United States. Indeed, I have failed to find, and the majority fails to cite, a single case in which a court has accorded trademark rights to a foreign mark holder absent a showing of use in the United States. Moreover, as all of the existing authorities to address this issue have concluded, such use requires that both the advertising that employs the mark and the rendering of the services to which the mark attaches take place in the United States. Advertising in the United States alone, no matter how extensive, does not suffice to demonstrate the necessary use in the United States.

Before concluding, I must note the potential consequences of adoption of the majority's rule. The rule announced by the majority today would mean that any entity that uses a foreign mark to advertise and sell its goods or services to United States citizens in a foreign country would be eligible for trademark protection under United States law.[7]

---

[7]It is worth noting here that, contrary to the majority's suggestion, *ante* at 16, proof of distinctiveness by way of secondary meaning does not necessarily operate as a check on the massive expansion of protection that would be accorded to foreign marks used solely in foreign countries under the majority's "use in commerce" holding. This is so because if a mark is inherently distinctive, the mark holder need not offer *any* proof of secondary meaning in order to receive protection. *See, e.g.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

Such a rule threatens to wreak havoc over this country's trademark law and would have a stifling effect on United States commercial interests generally. Before investing in a mark, firms and individuals would be forced to scour the globe to determine when and where American citizens had purchased goods or services from foreign subjects to determine whether there were trademarks involved that might be used against them in a priority contest or in an infringement action in the United States.[8] On the other hand, SBM and companies like it would, under the majority's rule, suddenly acquire a windfall of potential United States trademark rights for all of the goods and services advertised to and purchased by United States citizens while traveling in their countries. Like some sort of foreign influenza, these new entitlements would accompany American travelers on their return home, creating a vast array of new duties for individuals in the United States seeking to use the same or similar marks on goods or services sold in the United States.

Of course, if the law required us to permit this sort of reverse imperialism, whereby foreign subjects would be allowed to colonize American markets with their foreign trademarks based on sales conducted exclusively abroad, we would have no choice but to allow it. But the law does not compel this. Rather, the majority's new theory is contrary to all extant authority. Applying this authority here leads to only one conclusion: SBM's use in Monaco of its "Casino de Monte Carlo" mark does not constitute "use in commerce" of the United States sufficient to gain protection under the Lanham Act. Therefore, the grant of summary judgment to SBM should be reversed.[9]

---

[8]Although I appreciate the majority's concern with the policy objective of avoiding consumer confusion, *ante* at 35, I do not see how its rule would enhance the ability of trademark law to achieve this objective. Indeed, by allowing foreign mark holders to acquire trademark protection in the United States for goods and services sold exclusively abroad, the majority's rule would likely generate a whole new set of trademark disputes in the United States, exacerbating consumer confusion in the process. Moreover, for the reasons mentioned in the text, the "notice" function of trademarks vis-a-vis other firms would be severely undermined by the majority's rule. *See Zazu*, 979 F.2d at 503 (discussing notice function of "use" requirement under U.S. trademark law).

[9]Nor does the "famous marks" doctrine provide SBM any refuge. That doctrine has been applied so seldom (never by a federal appellate court

On this ground, the plaintiff companies were entitled to judgment as a matter of law.

## B.

My friends in the majority respond, at length but without effect, to the above analysis. *See ante* at 19-36. It is unclear to me precisely what they believe the cases, the TTAB decisions, and the treatises discussed above mean by their repeated directive that the statutory use in commerce requirement mandates use in the United States. *See ante* at 23-24 n.7. What is clear is that the majority contends that this directive does not require that both elements of the statutory use in commerce requirement occur in the United States. For, according to the majority, existing authority, with only two exceptions, presents no obstacle to the majority's own view that the second element of use in commerce — the rendering of services — need not occur in the United States. To bolster that argument, the majority valiantly tries to distinguish the wealth of authority discussed above. But its distinctions rest on a misreading of the cases. In truth, contrary to the majority's assertions, the new rule it announces today does place our court squarely in conflict with at least two of our sister circuits, the TTAB, and all other existing authority on this issue.

First, the Federal Circuit has clearly and repeatedly embraced a rule that directly conflicts with the majority's. *See, e.g.*, *Rivard v. Linville*, 133 F.3d 1446 (Fed. Cir. 1998), *aff'g* 41 U.S.P.Q.2d 1731 (TTAB 1997); *Person's*, 900 F.2d at 1567-69; *see also Imperial Tobacco*, 899 F.2d at 1579 noting that "'use' and 'nonuse' [of a trademark] mean use and nonuse in the United States"). The majority mistakenly attempts to diminish *Rivard's* precedential value, by explaining at length that this 1998 opinion was preceded by a prior unpublished opinion vacating an earlier TTAB decision. *See ante* at 25-27. In fact, the Federal Circuit's 1998 opinion does indeed consti-

---

and only by a handful of district courts) that its viability is uncertain. Perhaps for this reason, SBM conceded in the district court that it could not prevail on a famous marks argument without showing "some use" of its mark in the United States. *See* J.A. 196. Since SBM has shown *no* use of its mark in the United States, this concession forecloses appellate pursuit of this argument.

tute recent precedent on this precise issue, and clearly holds that the TTAB correctly concluded that "activity outside of the United States does not create rights in marks within the United States," 41 U.S.P.Q.2d at 1736; *Rivard*, 133 F.3d at 1449-50. The resulting rule is unambiguous: in order for a service mark to qualify for U.S. trademark protection, the services to which that mark attaches must be rendered in commerce in the United States.

The majority's attempt to distinguish *Person's* is equally misguided. For the majority contends that the *Person's* court, in holding that a foreign mark on goods sold abroad to a United States consumer was not used in the United States and so not subject to U.S. trademark protection, was relying on the fact that there had been only "foreign advertising of [the] product to foreign consumers." *See ante* at 23-24. But, in fact, *Person's* involved a mark for goods, not services; under the Lanham Act, as long as a mark is attached to the goods it signifies, there is no advertising requirement akin to that pertaining to service marks. *See* 15 U.S.C.A. § 1127 (paragraph 16). This was clearly the case in *Person's*, where the court specifically found that the Japanese clothing manufacturer had "applied a stylized logo bearing the name 'PERSON'S' to clothing in his native Japan," and that a United States citizen "purchased several clothing items bearing the 'PERSON'S' logo and returned with them to the United States." 900 F.2d at 1566-67. Thus, the *Person's* court could not have been relying on the lack of U.S. advertising as the basis for its holding; instead, it must have grounded its conclusion that the mark had not been used in the United States, and for that reason did not qualify for U.S. trademark protection, on the fact that the goods had not been sold in the United States. Although the majority does not suggest that the *Person's* holding was incorrect, applying the majority's new rule to the facts of *Person's* would lead to a holding exactly the opposite of that reached by the Federal Circuit. Because the mark owner in *Person's* sold his goods (with mark attached) *to a U.S. citizen*, those goods were, under the majority's new rule, sold in foreign commerce of the United States, thereby making the mark eligible for U.S. trademark protection.

The majority's new rule also conflicts with the Second Circuit's view on this question. In addition to rejecting my analysis of *Buti*, *ante* at 27, the majority dismisses the more recent Second Circuit

opinion in *Morningside*, 182 F.3d 133, which eliminates any doubt as to the correctness of my analysis of *Buti*. *Ante* at 27 n.10. In *Morningside*, the Second Circuit explained that a foreign financial services firm, unlike the Italian cafe owner in *Buti*, did have a valid mark under United States law because:

> this is not a case like *Buti v. Impressa Perosa, S.R.L.*, 139 F.3d 98 (2d Cir. 1998), in which the service mark claimant did not provide its actual business services (the conduct of a restaurant business) in the United States, but only advertised and promoted those services in the United States. Mere advertising and promotion of a mark in this country are not enough to constitute "use" of the mark "in commerce," so as to bring the activity within the scope of the Lanham Act (*id.* at 105). By contrast, here Morningside Group does conduct material aspects of its investment services in the United States.

*Morningside*, 182 F.3d at 138.

The majority also ignores the fact that the *Buti* court itself, 139 F.3d at 103-05, after holding that the foreign mark holder's promotional "activities in the United States were insufficient to establish 'use in commerce' of the Fashion Cafe name absent proof that [it] offered any restaurant services in United States commerce," explicitly embraced the TTAB rule adopted in *Rivard*, 41 U.S.P.Q.2d 1735-37, and *Mother's Restaurant*, 218 U.S.P.Q. at 1047-48 — the two TTAB cases that the majority explicitly concedes are "on point" with this case but which reach a contrary conclusion. *See ante* at 23, 30-36; *Buti*, 139 F.3d at 105 ("We take particular comfort in our reliance on the TTAB decisions cited above [*i.e.*, *Mother's Restaurants* and *Rivard*] because the principles enunciated therein rest on solid footing."). As the *Buti* Court explained, the basic principle animating these TTAB decisions has long been recognized by the Supreme Court. *Id.* at 105 (quoting *United Drug Co. v. Theodore Rectanus, Co.*, 248 U.S. 90, 98 (1918) ("[T]hat a trademark right is not limited in its enjoyment by territorial bounds, is true only in the sense that *wherever the trade goes attended* by the use of the mark, the right of

the [markholder] . . . will be sustained." (emphasis added by *Buti* court)).[10]

Furthermore, all of the other federal appellate decisions, which I have cited and the majority has rejected, do, in fact, explicitly embrace the general principle that United States trademark rights, or trade dress rights, cannot be based on "use" of the trademark or trade dress in a foreign country. *See Fuji Photo Film*, 754 F.2d at 599; *Patou*, 495 F.2d at 1270 n.4; *Logical Games*, 719 F.2d at 1239; *see also Rogers v. Ercona Camera Corp.*, 277 F.2d 94, 97 (D.C. Cir. 1960) ("We take it as settled that ownership rights in a trademark in the United States, in the case of private persons, exist only as an appurtenance to a manufacturing or marketing business conducted in the United States in which the mark is used." (footnote providing citation omitted)). The majority tries to distinguish these cases on the ground that although they admittedly involved exclusively "foreign use" such "'foreign use' . . . is not what is before us today" given the purchase of casino services by United States citizens in Monaco. *Ante* at 27.[11] But there is nothing in any of these cases (or any of the other cases cited in part I.A above) to suggest that the purchase of goods

---

[10]This principle — that the trade upon which the trademark is based (*i.e.* the goods or services to which the mark attaches) must reach those markets in which the trader seeks protection — inevitably leads to the conclusion that foreign conduct that does not reach United States markets does not suffice as a basis for according eligibility for U.S. trademark rights. *See United Drug*, 248 U.S. at 98; *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 416-17 (1916) ("But the mark, of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article. . . . [T]he trade-mark right assigned" cannot be "greater in extent than the trade in which it [is] used." (internal quotation marks omitted)). The majority's rule turns this principle on its head. Under its rule, whenever United States citizens go into foreign markets to purchase goods or services, they render any foreign marks attached to those goods and services eligible for trademark protection in United States markets.

[11]The majority also suggests that some language in *Logical Games* "portend[s] something akin to the very case before us today." *Ante* at 27. Actually, when read in context, it is clear that this language merely refers to situations in which an American importer purchases goods abroad and sells them in the United States.

or services by American citizens traveling abroad would somehow render the use of trademarks to sell those goods or services no longer "foreign." The crux of the matter, again, is whether the claimant can demonstrate use in the United States.

As for the numerous TTAB decisions holding that eligibility for trademark protection requires use in the United States, the majority dismisses most of them as inapposite and rejects the two (*Rivard*, 41 U.S.P.Q.2d at 1735-37, and *Mother's Restaurants*, 218 U.S.P.Q. at 1047-48) that it concedes are "on point." *Ante* at 30-35. In fact, the assertedly "inapposite" cases are not inapposite at all; each supports the basic rule that foreign "use," including sales to United States citizens traveling abroad, does not entitle a foreign mark to eligibility for trademark protection under United States law.[12]

---

[12]Thus, *Techex* cites the rule announced in *Mother's Restaurants*, supporting the conclusion that, for the TTAB at least, there is no valid distinction between foreign use that involves the purchase of goods or services by U.S. citizens traveling abroad and foreign use that does not involve such purchases. 220 U.S.P.Q at 83. *Stagecoach Properties* cites the same principle to reject the argument that use of a mark to sell hotel and restaurant services to United States citizens in Mexico sufficed to create U.S. trademark rights. 199 U.S.P.Q. at 349.

In *Oland's*, the Board concluded that the Canadian brewer had abandoned its American registration of the SCHOONER mark in the United States, even though the Canadian company had advertised with its mark extensively in the United States and even though United States citizens had purchased the company's beer in Canada. *Oland's*, 189 U.S.P.Q. at 482-83. Thus, although the Board concluded that a *prima facie* case of abandonment had been shown because the Canadian brewer had not sold any beer under the SCHOONER mark "in commerce which may be lawfully regulated by Congress," *id.* at 488, it did so on facts identical to those in this case (U.S. advertising plus sales to U.S. citizens in a foreign country).

Finally, in *Sterling Drug*, a goods case, the TTAB concluded that even though the German manufacturer had provided its drug "denoted as TALUSIN" to doctors who then prescribed it to United States citizens in Germany, such use did not qualify as "use in commerce" sufficient to merit protection under the Lanham Act. 159 U.S.P.Q. at 630-31. In attempting to distinguish this case on the ground that the advertising there was insufficient to merit trademark protection, the majority makes the same mistake it made in trying to distinguish *Person's*, i.e. importing the advertising requirement for service mark protection to trademark protection for goods.

Moreover, the majority's two reasons for rejecting *Rivard* and *Mother's Restaurants* — that "there is no other precedent to support these two decisions," *ante* at 30-31, and that their reasoning is in error because they "conflate" the two distinct elements of the use in commerce requirement, *ante* at 20 — do not withstand scrutiny. First, as demonstrated above, both the Federal Circuit and the Second Circuit have explicitly embraced the rule articulated in the TTAB's *Rivard* and *Mother's Restaurants* decisions, *see Rivard*, 133 F.3d 1446, and *Buti*, 182 F.3d at 103-105, and every other court has adopted an approach entirely consistent with those TTAB decisions. Second, in both *Rivard* and *Mother's Restaurants*, the TTAB, in expressly refusing to embrace an interpretation of use in commerce like that of the majority, took great pains *not* to "conflate" the two elements of the use in commerce requirement.

Thus, in the TTAB's 1997 decision in *Rivard* (not the earlier 1993 decision quoted by the majority), the Board canceled a United States mark registered by the owner of Canadian beauty salons because the Canadian owner had failed to demonstrate use in the United States, even though (1) he had engaged in extensive advertising that reached the United States; and (2) his beauty salon services had been sold to a "significant United States clientele." 41 U.S.P.Q.2d at 1735-36. In doing so, the Board took care to separate the two elements of the use in commerce requirement:

> We reject respondent's argument that through his advertising, he has used the mark ULTRACUTS in the United States since 1986. Under Section 45 of the Trademark Act, a mark is deemed to be used in commerce on services
>
>> when it is used or displayed in the sale or advertising of services *and* the services are rendered in commerce. . . . [emphasis added by TTAB]
>
> Similarly, we reject respondent's argument that his services are rendered in commerce because commerce is affected by the travel of customers from the United States to respondent's Canadian salons. . . . This case is readily distinguishable [from the single-location service provider cases cited by respondent] as respondent rendered no hair

dressing and beauty salon services in the United States during the relevant time period.

. . . .

It is well settled that activity outside the United States does not create rights in marks within the United States. *See Stagecoach Properties, Inc. v. Wells Fargo & Company*, 199 U.S.P.Q. 341 (TTAB 1978). The concept of territoriality is basic to trademark law. *See Person's Co. Ltd. v. Christman*, 900 F.2d 1565, 14 U.S.P.Q.2d 1477 (Fed. Cir. 1990). Thus, the fact that United States residents have availed themselves of respondent's services while in Canada does not constitute technical trademark use of respondent's service mark which is sufficient to obtain or maintain a registration in the United States.

*Id.* at 1736-37.

There is no conflation of the two elements of use in commerce here. In fact, the Board's conclusion is unambiguous: mere advertising that reaches the United States is not enough to constitute use in commerce; rather, such advertising must be combined with a rendering of services *in the United States* in order to "constitute technical trademark use of respondent's service mark" and thereby "obtain or maintain a registration in the United States." *Id.* at 1737. Thus, contrary to the majority's assertion, *ante* at 32, the Board did in fact "reject a position similar to that present here" (indeed, the relevant facts are identical to those here: advertising that reaches the United States plus purchase of services by United States citizens abroad) to reach precisely the opposite conclusion — "that no qualifying commerce was present." While the majority may disagree with the Board's conclusion (and with the Federal Circuit's published affirmance of this conclusion, 133 F.3d 1446), it can not fairly do so on the ground that the Board's reasoning somehow conflated the two elements of use in commerce.

The same is true for *Mother's Restaurants*, which presents a virtually identical set of facts in the context of a priority contest. In that case, the opposer argued that advertising of Canadian restaurant ser-

vices that reached into the United States combined with purchase of those services by United States citizens traveling in Canada sufficed to establish priority of use in the United States. 218 U.S.P.Q. at 1047-48. In rejecting this claim, the Board certainly did not engage in anything approaching the elaborate "use in commerce" analysis advanced by the majority today. But the Board, like every court to address this issue, clearly saw no reason to do so because it determined that advertising that reached American consumers could not *by itself* provide the basis for trademark protection in the United States absent a showing of "use of the mark on goods or services sold and/or offered in the United States." 218 U.S.P.Q. at 1048. Thus, the Board recognized and correctly addressed *both* elements necessary to establish priority of use in disposing of opposer's claim. That it reached a contrary conclusion from the majority when confronted with the same set of relevant facts simply illustrates, once again, the extent to which the majority's rule breaks with all prior authority on the matter.

## II.

Even if my colleagues in the majority had correctly resolved the "use in commerce" issue, I would nonetheless have to dissent. This is so because, contrary to their holding, the district court erred in resolving disputed material facts when granting summary judgment to SBM on the secondary meaning issue and applied an improper secondary meaning analysis.

## A.

The majority properly acknowledges both that the district court decided the case on cross motions for summary judgment and that in doing so the court engaged in factfinding. *Ante* at 4-5. However, the majority apparently believes that this was justified because the parties agreed to submit on the "voluminous record" to a bench trial and "did not contradict one another's proffered facts, but only disputed the inferences that a fact-finder could draw from those underlying facts." *Id.* at 4. In truth, the parties never agreed to submit on the "voluminous record" to a bench trial. Rather, the parties and the district court agreed that the court would review that record and, on the basis of it, grant summary judgment to the appropriate party, unless the court

determined that material factual disputes required a trial, in which case the court would hold a trial.

Thus, the district court was not entitled to find facts and resolve conflicting inferences at this stage of the proceedings. Nor was it allowed to draw reasonable inferences from the facts before it as if it were a factfinder. Indeed, given the posture of the case, the court was required to resolve all inferences in favor of the non-moving party. Because the plaintiff companies opposed SBM's motion for summary judgment on trademark infringement, they were entitled to all such favorable inferences in the context of the secondary meaning inquiry. *See United States v. Diebold Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."); *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) ("When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'. . . When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." (citations omitted)).

The small portion of transcript quoted by the majority, when considered in context, does not suggest that the parties ever agreed to anything other than the attempted resolution of the case via summary judgment. Both before and after the exchange quoted by the majority, which for clarity I emphasize in the material quoted below, the district court and the parties made their intentions clear:

> THE COURT: . . . I am going to proceed to scour the record, if you all submit it to the Court on summary judgment, and I will make my own determinations under Rule 56, Local Rule 56(b) and the like, and I will see what I ultimately come up with. If you have some concerns about that, we will go ahead and have a trial on Monday.
>
> [Counsel for plaintiff companies]: . . . . we would submit with the record to the Court for consideration without a trial. . . .

. . . .

THE COURT: So then it seems to me that the most efficient way to proceed is to decide now — is for me to decide whether there is a necessity for a trial. It seems to me that there are no experts. I have excluded the plaintiff's. That would have been an issue of dispute, presumably. . . . so *there is really no reason why the Court should not dispose of this matter on the current record; isn't that right?*

[Counsel for plaintiff companies]: *I believe that's correct, your Honor.*

. . . .

[Counsel for SBM]: *I think that sounds sensible, your Honor.*

. . . .

[Counsel for plaintiff companies]: *That's exactly what I would ask for, your Honor.*

. . . . .

THE COURT: . . . I will now proceed to attack this matter on the basis of the existing summary judgment record.

. . . . If there is a potential hearing, it will be in two weeks or three weeks or four weeks, when I get to the bottom.

[Counsel for SBM]: Okay.

THE COURT: There is always the possibility — I don't see it happening in this case, but I have had the experience of a voluminous record where counsel and I thought it was properly disposable on summary judgment, and when I finally got through working my way through this voluminous record, out popped a disputed issue of fact that I had

to call to the parties' attention. And that may happen, but I don't think so. I don't think so.

. . . .

In any event, so unless I hear from counsel jointly on Monday on this issue, I will assume that I will proceed on the summary judgment issue — on the summary judgment record, and then I will ask for oral argument only if it's needed.

I will enter an order today indicating that. . . .

J.A. 998-1005 (emphasis added to indicate portion of transcript quoted by majority).

That very day the district court did issue an order stating: "The parties, by counsel, agreed that the matter should be submitted to the Court *on the existing summary judgment record*. Should further oral argument be necessary, the parties will be advised." Order, December 7, 2001 (emphasis added).

Moreover, after filing its initial memorandum opinion granting summary judgment to SBM, when the district court reopened the proceedings on the plaintiff companies' motion for reconsideration, the court continued to recognize that the matter would be resolved either on summary judgment or after an actual trial, if the court determined that there were disputed issues of fact. For example, the court noted that "Rule 56(e) requires a party opposing summary judgment to submit affidavits setting forth specific facts showing that there is a genuine issue for trial." J.A. 1020-21. In a later exchange with counsel for SBM, the court again remarked, "[y]our predecessor indicated in court that he thought it was appropriate to submit it on summary judgment. . . . So you need to have that in mind. Now — but I want to get these issues correct, and so if the record needs [to be] reopened for either side, I will do so, and try the matter if necessary." J.A. 1023. The district court also recognized that "[t]he *Celotex* trilogy of cases . . . govern in this case." J.A. 1024-25. Finally, the court stated that in its view, "the defendants either prevail or don't prevail on sum-

mary judgment on the record as it existed at the time the original memorandum opinion issued." J.A. 1041.

Given all of these statements and the fact that the court ultimately granted SBM *summary judgment*, JA 1115, it is clear that the majority is mistaken in concluding that the parties "agreed to submit the voluminous record to the court" for a bench trial. *Ante* at 4. The parties agreed only to submit the voluminous record as it stood — without further evidence or witnesses — for determination on summary judgment, if that was possible, *i.e.*, only if, as the district court put it, no "disputed issue of fact . . . popped out," J.A. 1003, after the court reviewed the record. Therefore, the district court's resolution of material factual disputes and conflicting inferences from the submitted facts when granting summary judgment constituted error, which the majority compounds with its attempted justification.

### B.

The district court's error in resolving material factual disputes infected its holding on secondary meaning. In addition, the district court erred in the manner in which it conducted its secondary meaning inquiry.

In order to receive trademark protection for a geographically descriptive mark like "Casino de Monte Carlo" the party seeking protection must prove not only that the mark was used in commerce but also that the mark has attained secondary meaning. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990).[13] A party establishes secondary meaning "when, 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself.'" *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11 (1982)); *see also Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 421

---

[13]For those marks found to be inherently distinctive, the mark holder would not need to offer any proof of secondary meaning to merit protection (assuming, of course, that the mark also satisfies the use in commerce requirement). *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

(4th Cir. 1998) ("Secondary meaning has been established in a geographically descriptive mark where the mark no longer causes the public to associate the goods with a particular place, but to associate the goods with a particular source." (internal quotation marks, alteration, and citation omitted)).

In this circuit, "[p]roof of secondary meaning entails vigorous evidentiary requirements." *Perini*, 915 F.2d at 125 (listing six factors "relevant to" but "not dispositive of" secondary meaning inquiry — "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use" (internal quotation marks and citation omitted)). Ordinarily, a party claiming trademark protection must meet its burden on secondary meaning by offering proof under the *Perini* factors. We held, in *Larsen v. Terk Technologies Corp.*, 151 F.3d 140, 148-49 (4th Cir. 1998), however, that evidence of "intentional, direct copying" of a mark, provides the party claiming protection with "a presumption of secondary meaning." Under the *Larsen* rule, if the alleged infringer fails to rebut that presumption, the party claiming infringement is entitled to judgment. *Id.*

But even if the *Larsen* presumption did apply here,[14] it must be properly applied. In *Larsen*, we expressly held that an alleged infringer could rebut the presumption. *Id.* at 148 (noting that evidence of intentional, direct copying creates a presumption entitling the party claiming infringement to judgment "in the absence of rebutting proof"). Because the alleged infringer in *Larsen* "failed to rebut the presumption," we did not there address the question of the effect of such rebuttal evidence. However, the ultimate burden of proof always remains on the one asserting a claim. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); Fed. R. Evid. 301. Therefore, *Larsen* must be read as consistent with Fed. R. Evid. 301, which provides that "a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet

---

[14]Of course, I do not believe the *Larsen* presumption applies here because copying a foreign trademark that has not been used or registered in the United States violates no law of this country. *See, e.g.*, *Buti*, 139 F.3d at 106; *Person's*, 900 F.2d at 1570.

the presumption, but *does not shift to such party the burden of proof* in the sense of risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." Thus, evidence proffered by an alleged infringer that rebuts the *Larsen* presumption shifts the burden of establishing secondary meaning back to the party seeking protection, who must then make the requisite showing under the *Perini* factors that its mark had in fact attained secondary meaning.

Properly applied to the case at hand, this would mean that the plaintiff companies' extensive evidence rebutting the presumption of secondary meaning, including abundant third-party use of the Casino de Monte Carlo mark by both land-based and web-based casinos located in the United States, at least some of which SBM conceded it knew of yet made no effort to eliminate, would shift the burden of proof on this issue back to SBM. At that point, SBM should have been required to prove secondary meaning under the *Perini* factors. The district court, however, did not interpret *Larsen* in this way and so did not require SBM, the party seeking protection, to prove that its mark had, in fact, attained secondary meaning.[15]

Instead, the district court found that the *Larsen* presumption applied, even though "there [w]as no direct evidence of intentional copying," because "inferring intent of the plaintiff companies is proper given that the putative infringing term is identical to SBM's mark and the infringing use is in the same relevant market: gambling services." Assuming such an inference is permissible, surely the plaintiff companies' evidence of similar extensive third-party use (known and undisturbed by SBM) should have been considered as rebutting the presumption of secondary meaning, thereby shifting the burden of proof back to SBM on that issue. But that did not happen. Upon concluding that the *Larsen* presumption applied, the district court then determined not whether *SBM* had *proved* secondary mean-

---

[15]Contrary to the majority's suggestion, the district court did not "employ[ ] two distinct analyses to assess the secondary meaning," beginning with the "traditional *Perini* analysis" and then "furthermore" proceeding under *Larsen*. *See ante* at 17-18. Rather, the district court *first* applied the *Larsen* presumption and then considered the *Perini* factors in light of this presumption.

ing but whether *the plaintiff companies* had "show[n] that the *Perini* factors *weigh against* secondary meaning." (Emphasis added). Thus the district court placed the burden of proof on the wrong party — requiring the alleged infringer to prove *no* secondary meaning, rather than requiring SBM to prove secondary meaning.

The district court also made improper factual determinations in resolving the matter in SBM's favor. For example, the district court determined that the extensive third-party use of the mark, constituted evidence of "plagiarism." Yet a fact-finder could well infer from this evidence that SBM's "Casino de Monte Carlo" mark was not distinctive enough to have achieved the requisite level of secondary meaning necessary to merit protection under United States law. *See, e.g.*, *Echo Travel, Inc. v. Travel Assoc., Inc.*, 870 F.2d 1264, 1269 (7th Cir. 1989) (stating that evidence of "third party use of a substantially similar mark to promote the same goods or services to the same consumer class weighs against a finding that the consumer class associates the mark with *one* source" (emphasis in original)).[16]

Similarly, the district court ignored the evidence of SBM's failure to police its mark in any systematic or vigorous way; yet a fact finder could conclude from this evidence that SBM's mark had lost any distinctiveness that it may have had. *See* McCarthy, § 17:17 ("'Without question, distinctiveness can be lost by failing to take action against infringers. If there are numerous products in the marketplace bearing the alleged mark, purchasers may learn to ignore the "mark" as a source identification. When that occurs, the conduct of the former

---

[16]The majority's recognition, *ante* at 5 n.4, 18, that conflicting inferences could be drawn from the plaintiff companies' evidence of third-party use simply confirms, once again, that the district court erred in drawing the inferences it did given that it decided the case on summary judgment. Because the plaintiff companies were the non-moving party on the issue of secondary meaning, any such inferences should have been viewed and resolved in the light most favorable to them. *See Diebold*, 369 U.S. at 655; *Harley-Davidson Motor Co., Inc. v. Powersports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) ("The phrase in the light most favorable to the nonmoving party . . . simply means that summary judgment is not appropriate if the court must make a choice of inferences." (internal quotation marks and citation omitted)).

owner, by failing to police its mark, can be said to have caused the mark to lose its significance as a mark.'" (quoting *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 766 (C.C.P.A. 1982)).

For these reasons, I would conclude that, even if the plaintiff companies were not entitled to summary judgment on the use in commerce question (which I believe they were), they have produced sufficient evidence to raise genuine issues of material fact as to whether SBM shouldered its burden under the *Perini* factors. Accordingly, even if the majority's holding on "use in commerce" were correct, I would reverse the district court's grant of summary judgment to SBM.